UNITED STATES, Appellee

v

GERALD L. SCHMIDT, Private First Class,
U. S. Army, Appellant

16 USCMA 57, 36 CMR 213

No. 18,829

March 4, 1966

Captain *John C. Smuck* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Martin S. Drucker.*

*Captain Michael E. Phenner* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

Convicted by general court-martial upon charges of (1) extortion and (2) wrongful communication of a threat, the appellant was sentenced to a bad-conduct discharge, total forfeitures, and confinement at hard labor for eighteen months, and reduction. The convening authority reduced the period of confinement to nine months and an Army board of review modified the findings and sentence to the extent of disapproving the punitive discharge.

The two offenses for which Schmidt was convicted, while comprising separate elements, are, under the facts of this case, essentially the result of one transaction. They were the outgrowth of a single action of the appellant in handing to his commanding officer, in the latter's office, an envelope addressed to him which contained the following communications, admitted at trial as Prosecution Exhibits 2 and 3:

### PROSECUTION EXHIBIT 2

"Sir:

"The following newspaper article will appear in a number of the nations [sic] newspapers in [sic] I am given any kind of disciplinary actions [sic] against me prior to 10 January 1965.

> GERALD L. SCHMIDT
> RA 16 721 180
> SP4, Hq Co, 1st Bn,
> 63d Armor"

### PROSECUTION EXHIBIT 3

"TO THE EDITOR:

"In the interest of the Rights of the American Soldier and the public information the following article is submitted for publishing:

"FORT RILEY SOLDIER RECEIVES PUNISHMENT FOR EXERCISING RIGHTS

"Specialist Fourth Class Gerald L. Schmidt of Headquarters Company, First Battalion, 63d Armor, Fort Riley, Kansas has been given unfair punishment because he wrote to his Congressman informing the Senator of the poorly prepared food and extremely crowded livings [sic] conditions existing in parts of Fort Riley, Kansas. Specialist Schmidt had been threatened by his First Sergeant in that he would be penalized for any minor incident. The First Sergeant keeps a book of anything which he may use as a trap for Specialist Schmidt. Noone [sic] can be given direct punishment for writing to his Congressman or anyone deemed necessary to handle his complaint. But Specialist Schmidt was told by his First Sergeant that he would be 'reduced in grade for running down the company'. Do you think that is an honest and fair way of running our U. S. Army?"

The commanding officer read these documents and then told Schmidt to "Get the hell out of my office." No one else was present at the time.

Appellate defense counsel alleges that the evidence is insufficient in law to sustain the offenses of extortion or communicating a threat. In addition, we granted appellant's petition to consider whether the institution of disciplinary proceedings against the accused constituted an attempt to restrict the exercise of his rights under the provisions of 10 USC § 1034:

"No person may restrict any member of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States. (Aug. 10, 1956, ch. 1041, 70A Stat 80.)"

This provision of the General Military Law for the Armed Forces was originally enacted by the Congress in

1951 (June 19, 1951, chapter 144, section 1(d) (last paragraph), (65 Stat 78)), as an amendment to the Selective Service Act of 1948 (62 Stat 604). The purpose behind this legislation is obvious and the right absolute, within the strictures specifically delineated therein.[1]

In the latter part of June 1964, this appellant wrote a letter to his Senator complaining of the poorly prepared food and crowded living conditions in parts of the base where he was stationed.[2] Prior to that time he had received twelve ratings for conduct and efficiency, ten of which were excellent and two unknown. His first sergeant, for whom he worked directly as orderly room clerk, informed the appellant that he did not feel he was justified in sending the letter. He then told appellant he was to report to the mess hall for duty from seven to eleven-thirty a.m. and to return to the orderly room in the afternoon and handle his regular duties there. This duty was performed for four or five days, necessitating evening work for the appellant in order to keep up. Thereafter he was relieved of the mess hall duty and resumed his position in the orderly room. At about this same time, the appellant requested a transfer out of the company and completed the necessary forms giving them to his first sergeant. They were returned for correction and then forwarded through channels to battalion headquarters.

On July 22, the first sergeant gave the appellant "a direct order" to post some cards in accordance with the morning report. On the 26th of July he noted the cards had not been posted and the following morning informed the accused he was going to recommend that disciplinary action be taken for his failure to obey the order. That evening the company commander gave the accused forty-eight hours to decide whether to accept punishment under Article 15 or trial by court-martial for violation of Article 92,

Uniform Code of Military Justice, 10 USC § 892. On the following morning the appellant reported to the commanding officer and handed him the above-quoted documents.

It is patently obvious that the appellant reacted to the proposed disciplinary action in a precipitate and immature fashion. This observation is borne out and made more certain by the results of a psychiatric examination, conducted during and made part of the Article 32 investigation, in which the appellant was diagnosed as having a "Schizoid Personality, chronic, moderate, manifested by serious mindedness and eccentricity." The brigade chaplain, who knew the appellant well and thought him to be a "good man," nevertheless believed him to be immature, lacking in judgment, and headstrong. He plunges into something first and then he thinks about it. Before any charges had been filed, the chaplain accompanied the appellant to the company commander's office. There he heard Schmidt aver to the commander that "he didn't mean it the way the letter read, he didn't mean a threatening tone."

We pause here to note that in addition to the offenses for which he was convicted, the appellant was also charged with failure to obey the above-mentioned order. The court-martial, however, found him not guilty of that offense.

Extortion and threat are very serious criminal offenses, each carrying with them maximum permissible punishment of dishonorable discharge, total forfeitures, and confinement at hard labor for three years. The fact that in this case they were considered as multiplicious for sentencing purposes, does nothing to detract from the stigma attached to a conviction for violation thereof. As a general rule, the reason that one ██ has for threatening another or committing extortion is not a defense. However, as

---

[1] See 97 Congressional Record 3775–3777 (1951).

[2] One other serviceman wrote to the President of the United States complaining of the poorly prepared food.

appropriately stated by the Court of Appeals of New York in People v Hughes, 137 NY 29, 32 NE 1105, 1107 (1893):

". . . Conduct takes its legal color and quality more or less from the circumstances surrounding it, and the intent or purpose which controls it, and the same act may be lawful or unlawful as thus colored and qualified."

In his testimony on the merits, the appellant gave the following explanation for his action:

"I wrote the newspaper article with the intention of giving it to . . . [the commanding officer] to tell him of what my intentions were that I had planned on, sending it to a number of papers to let them know that I was being persecuted more or less by the First Sergeant more or less for writing to my Senator.

. . . . .

"I thought maybe he'd talk to the First Sergeant and see what was bugging the two of us, why we weren't getting along with each other."

The commanding officer didn't ask or wait for any explanation for what must have been for him an astonishing action on the part of this highly rated soldier. He immediately got "a little bit mad as this didn't set too well with me, and I just wanted to get him out of there." A later attempt at explanation by the appellant, in the presence of the brigade chaplain, had no apparent effect for the commanding officer was the accuser.

The appellant felt he was being persecuted for having exercised a right fully protected by statute; a right deeply rooted in the American concept of representative government. He denied receiving a direct order to post any cards on July 22d, and when informed by the commanding officer of the impending action, he was too astonished to reply. He alleged that the first sergeant told him "he was going to see that I was reduced in grade for running down the company by writing to the Senator." The first sergeant averred that he had not so informed the appellant. What he did state, according to his testimony, was that, "I told Schmidt that I didn't consider him as having any loyalty to me, as a company clerk I felt that I could not trust him, and I did not want him no longer working as a company clerk in my office." The first sergeant keeps a notebook "like any other 1SG on the soldiers in my company who I feel could be potential disciplinary actions. . . . Right now Sp4 Schmidt is the only person in my notebook." The appellant had not received any court-martial or disciplinary action against him prior to this incident. His prior performance record, as evidenced by his efficiency and conduct ratings, had been eminently satisfactory and during an Inspector General's inspection conducted in early July, the appellant received no "gigs" on his work.

It is not necessary nor are we here disposed to decide definitely whether the originally proposed action under Article 15 was directly or indirectly the result of the appellant's letter to his Senator. Suffice to say the aura of suspicion is strong and it so appeared to the appellant. He felt threatened thereby and without consideration of the possible consequences sought removal of the threat by taking this means of telling his commander that he would expose it if it was carried out.

Under the common law, intent was a crucial element in every criminal offense. As stated in 1 Bishop, A Treatise on Criminal Law, 9th ed, section 287:

"There can be no crime, large or small, without an evil mind. . . . It is therefore a principle of our legal system, as probably it is of every other, that the essence of an offence is the wrongful intent, without which it cannot exist."[3]

---

[3] See numerous cases cited in footnote 3, 1 Bishop, A Treatise on Criminal Law, 9th ed, section 287, page 192.

The application of this principle to statutory law was quite extensively explored by the Supreme █ Court in Morissette v United States, 342 US 246, 96 L ed 288, 72 S Ct 240 (1952), and a perusal thereof is recommended to the interested reader. It is enough for our purpose to say that a wrongful intent is necessary before culpability can attach for the offenses of which the appellant was convicted.

It is a general rule of law that the question of intent can never be ruled as a question of law, but █ must be submitted to the jury. "Where, however, . . . [a reviewing] court is convinced that the verdict is wrong and unjust and has been rendered for and on account of passion, prejudice, or a *misconception of the law as applied to the facts*, this court does not, and should not, hesitate to so declare." Reynolds v State, 27 Ala App 106, 166 So 436 (1936). (Emphasis supplied.)

Having given full consideration to the "legal color and quality" of the appellant's conduct and █ "the circumstances surrounding it" (People v Hughes, supra), we are constrained to hold that *under the particular facts of this case* affirmance of his conviction would not comport with the fairness, integrity or public reputation of judicial proceedings. Cf. United States v Atkinson, 297 US 157, 80 L ed 555, 557, 56 S Ct 391 (1936).

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. The charges are ordered dismissed.

FERGUSON, Judge (concurring):

I concur.

This record demonstrates beyond cavil a campaign of harassment and intimidation of a young soldier because he exercised his legal and unfettered right as a citizen and member of the armed forces to write a letter of complaint to his Senator. When that harassment and threatened misuse of the disciplinary processes of the Uniform Code of Military Justice led him to inform his commanding officer that he would bring such infamous treatment to the attention of the public, he was promptly charged with extortion and communication of a threat, in violation of Code, supra, Articles 127 and 134, 10 USC §§ 927, 934, respectively.

Military discipline, harsh as it may often seem, is absolutely essential to the efficient functioning of our armed forces. But when it is perverted into an excuse for retaliating against a soldier for doing only that which Congress has expressly said it wishes him to be free to do, this Court would be remiss in its duty if it did not immediately condemn the effort to persecute him and stand as a shield between him and his superiors. No discipline can exist without fairness and justice, and this case bespeaks the lack of both.

When, therefore, it appears that an accused has announced he intends to expose to public view the unlawful and unjust measures which have been taken against him in reprisal for his resort to a right expressly granted by statute, his fair statement of the course he intends to pursue, should such tactics be continued in effect, does not amount to an unlawful threat or an extortionate communication. Perhaps he should have accepted the nonjudicial punishment and appealed; or demanded trial by court-martial and removed the controversy to another arena; or complained to the Inspector General. It was also open to him respectfully to make known his intention to air his just grievance publicly, without being subjected to adjudication as a blackmailer. The right to petition Congress for a redress of grievances is too dear to permit its exercise to be limited by petty tyrannies. I am of the view, therefore, that the evidence is legally insufficient to support the findings of guilty and join with my brothers in setting them aside and ordering the charges dismissed.

QUINN, Chief Judge (concurring in the result):

Appellate defense counsel have advised the Court that, pending the appeal, the accused was separated from the service with a general discharge. Such action, in my opinion, abates the proceedings against him. See my dissent in United States v Speller, 8 USCMA 363, 24 CMR 173. For that reason I join in the result reached in the principal opinion.