UNITED STATES, Appellee

v

GEORGE W. DANIELS, Private First Class,
U. S. Marine Corps, Appellant

19 USCMA 529, 42 CMR 131

33~4

530

No. 22,252

July 10, 1970

*Edward F. Sherman, Esquire*, argued the cause for Appellant, Accused. With him on the brief were *Melvin L. Wulf, Esquire, Conrad J. Lynn, Esquire, Captain Richard J. Riordan*, USMCR, and *Lieutenant Donald B. Brant, Jr.*, JAGC, USNR.

*Lieutenant James E. Akers*, JAGC, USNR, argued the cause for Appellee, United States. With him on the brief were *Colonel C. R. Larouche*, USMC, *Lieutenant Colonel Charles J. Keever*, USMC, *Captain Lester G. Fant, III*, USMCR, *Commander Richard L. Fruchterman, Jr.*, JAGC, USN, and *Lieutenant Thomas F. Bastow*, JAGC, USNR.

*Leon E. Irish, Esquire*, argued *amicus curiae*. With him on the brief were *Jacques Feuillan, Esquire, H. David Rosenbloom, Esquire*, and *John E. Nolan, Jr., Esquire*.

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial at Camp Pendleton, California, convicted the accused of eight specifications, laid under Article 134, Uniform Code of Military Justice, 10 USC § 934, alleging that, with the intent to interfere with the loyalty, morale, and discipline of named members of the Marine Corps, he urged and attempted to cause insubordination, disloyalty, and refusal of duty on the part of said members contrary to 18 USC § 2387. The findings of guilty were affirmed by a board of review, but it modified the sentence by reducing the period of confinement from ten years to four years.

Appellate defense counsel contend that under O'Callahan v Parker, 395 US 258, 23 L Ed 2d 291, 89 S Ct 1683 (1969), the court-martial had no power to try the accused for conduct violative of 18 USC § 2387, because that offense is cognizable in a Federal civilian court and is not specially service-connected. In United States v Harris, 18 USCMA 596, 40 CMR 308 (1969), we held that a violation of provisions of a Federal civilian criminal statute, specifically 18 USC § 793(c) and (g), may be tried by court-martial, as authorized by Congress in Article 134 of the Uniform Code, if the wrongful conduct is also service-connected. In other cases, we sustained trial by court-martial for misconduct having service-connection or military signif icance, notwithstanding the conduct also violated a provision of the Fed eral civilian criminal code. For example, we sustained trial by court-martial for a robbery begun on a military base, although a Federal district court also has cognizance of the act under either 18 USC § 2111 or 18 USC § 13. United States v Crapo, 18 USCMA 594, 40 CMR 306 (1969). Similarly, in United States v Williams, 18 USCMA 605, 40 CMR 317 (1969), we sustained the exercise of court-martial

jurisdiction over a bad check offense committed at Fort Bragg, North Carolina, notwithstanding the act was cognizable in a Federal district court under the provisions of 18 USC § 13. Here, the wrongful acts were committed on a military base with the intent and for the purpose of affecting members of the military service. These circumstances impart sufficient military significance to the wrongful conduct to justify trial by court-martial. United States v Allen, 19 USCMA 31, 41 CMR 31 (1969); United States v Fields, 19 USCMA 119, 41 CMR 119 (1969).

In a second assignment of error, the accused challenges the sufficiency of the evidence to support the findings of guilty. His central contention is that the statements attributed to him were merely "expressions of grievances and private opinions" for which he cannot be prosecuted without violating his constitutional right to free speech and to the exercise of his religion. The right to believe in a particular faith or philosophy and the right to express one's opinions or to complain about real or imaginary wrongs are legitimate activities in the military community as much as they are in the civilian community. See United States v Schmidt, 16 USCMA 57, 36 CMR 213 (1966); United States v Wolfson, 36 CMR 722, 728 (1966). If the statements and the intent of the accused, as established by the evidence, constitute no more than commentary as to the tenets of his faith or declarations of private opinion as to the social and political state of the United States, he is guilty of no crime. However, if competent evidence reveals conduct not protected by the Constitution and condemned by statute, the findings are proper. Hartzel v United States, 322 US 680, 88 L Ed 1534, 64 S Ct 1233 (1944); United States v Howe, 17 USCMA 165, 37 CMR 429 (1967). We turn, therefore, to consideration of the requirements of the statute.

Title 18, United States Code, § 2387, has its roots in the Espionage Act of 1917. The language of the current statute and its progenitor are substantially the same. Dunne v United States, 138 F2d 137 (CA8th Cir) (1943), certiorari denied, 320 US 790, 88 L Ed 476, 64 S Ct 205 (1943). The judicial construction accorded the predecessor statute is, therefore, appropriate to the purposes and requirements of the current provision. United States v Cook, 384 US 257, 16 L Ed 2d 516, 86 S Ct 1412 (1966); United States v Rogan, 8 USCMA 739, 25 CMR 243 (1958).

In *Hartzel,* supra, the Supreme Court of the United States considered the predecessor statute. As in this case, the issue was whether the evidence was sufficient to sustain a conviction. The defendant had published three articles which, in material part, depicted World War II as a gross betrayal of the United States and advocated transformation of the war into an " 'internal war of race against race.' " Copies of the articles were disseminated among civilian and military organizations and persons. The Supreme Court held that inasmuch as the statute restricted the defendant's constitutional right to speak and write freely it was to be strictly construed. The Court determined that the statute required not only proof of prohibited acts, but two other "elements." One, which the Court described as the "subjective" element, was that at the time of commission of a prohibited act the defendant possessed the specific intent proscribed by the statute. The other element, which the Court characterized as an "objective" element, consisted of a requirement that there be "a clear and present danger that the activities in question will bring about the substantive evils" delineated in the statute. *Id.,* 322 US, at pages 683, 686–687. With *Hartzel's* analysis of the elements of the offense as the frame of reference, we turn to the evidence against the accused.

The accused claimed membership in the Black Muslim sect. On frequent occasions he talked about the tenets of his faith to black members of his

unit. He also talked about the involvement of the United States in the Vietnam war and the participation of black troopers of the Marine Corps in that war. Specification 1 of the charge alleges that starting in May 1967, at Cherry Point, North Carolina, and continuing into July 1967, at Camp Pendleton, California, with the intent to interfere with, impair, and influence the loyalty, morale, and discipline of Private First Class J. W. Jones, the accused urged and attempted to cause insubordination, disloyalty, and refusal of duty by Jones. Jones testified as a Government witness.

According to Jones, while stationed at Cherry Point, he spoke to the accused "quite frequently." Their conversations, which were largely "discussions" with other blacks in the unit, ranged over many subjects including the accused's religion and his attitude toward the Vietnam war. "[Q]uite often" the accused declared that blacks did not have a country; that the Vietnam war was a "white man's war" and blacks did not "belong over there." Some of the participants "sort of" made "fun" of the accused's religion, and "most of the time" Jones personally disagreed with the accused.

At different times, Jones and the accused were transferred to Camp Pendleton for further training in preparation for duty in Vietnam. At Camp Pendleton they again met "quite often," and again discussed the war in Vietnam. Riots occurred in several major cities in the country and the discussions included comments on the riots. The accused frequently reiterated his early declarations that Vietnam was a white man's war and blacks did not "belong" in it. Asked if the accused had ever "directly" told him not to go to Vietnam, Jones replied: "Yes, sir, he did. Not—In a way he did. He said I shouldn't go. He told me I shouldn't go to Vietnam."

On July 12, 1967, Captain H. J. Trautwein, Jr., the commanding officer of the unit, met with the accused, pursuant to the accused's request. The meeting lasted for more than three hours. The accused told Captain Trautwein that he could not "in conscience" go to Vietnam "because this was a white man's war" and he would only have to return to "fight the white man in the states." The accused requested a change in his military occupation specialty or release from active duty. Trautwein assured him he would "do all we could" to obtain either aspect of the requested relief. He asked that in the meantime the accused not "spread" his philosophy among company members because there were "people that didn't want to be there" and they were "particularly susceptible" persons. It may fairly be inferred from Jones' testimony, and the testimony of other witnesses, that Trautwein did not persuade the accused to silence. Jones continued to meet the accused sometimes two or three times a day and the accused continued to declare that blacks had no country and should not go to Vietnam because it was a white man's war.

On July 27, 1967, Jones and other members of the company were at the rifle range. On notification by the accused and a Corporal W. L. Harvey, Jr., the black troopers assembled at two meetings, one held immediately after the noon meal and the other after the evening meal. Several witnesses testified about the noon meeting. The substance of their testimony is to the effect that the accused addressed the assembled black troopers.[1] The accused told the assembled blacks that there was no need for them to go to Vietnam because Vietnam was a white man's war and he "didn't see . . . [any] sense in going overseas and fighting the white man's war." He told the assemblage that he would prepare a list of names of the "people that want to request mast," and that they would go to talk to the Captain. Jones did not attend the morning assembly, but he did attend the evening meeting. He testified that at that time the accused stated: "We were going to request mast the next day

_____

[1] Some white Marines stood at the edge of the group of blacks.

533

. . . and refuse to go and fight in Vietnam."

Jones and others put their names on a sheet of paper to request mast. The next morning when a call was issued for the persons who had requested mast, he joined the formation which was made up of persons who had attended the meetings the previous day. At the company office, Jones indicated he had requested the mast because he was going to refuse to go to Vietnam since it was a white man's war. However, when informed of the nature and consequences of a refusal to obey orders, he decided not to go through with his mast request. At trial, he maintained that he would not have requested the mast on his own initiative, and had done so because of the meeting he had attended the previous day.

We consider first whether the evidence is sufficient to support the findings by the court-martial that the accused made the declarations attributed to him with the "intent to interfere with, impair, and influence the loyalty, morale, and discipline" of Jones as alleged in the specification. Appellate defense counsel argue that the accused lacked the requisite intent because for the most part his declarations were made in barracks "bull sessions" and represented "expressions of . . . personal beliefs . . . and . . . grievances" lacking any "element of urging others to do anything." The form and the place of a declaration may indeed indicate the intent with which the declaration is made, but they are not determinative. The intention of a speaker may be determined from surrounding circumstances as well as from the language in which his declarations are framed. Hartzel v United States, supra, 322 US, at page 691; see United States v Noriega, 7 USCMA 196, 21 CMR 322 (1956). The fact that a declaration is phrased in the form of personal belief does not necessarily negate the existence of an intention to impair or influence the listener's loyalty, morale, or discipline. United States v Dembowski, 252 Fed 894 (ED Mich) (1918). Nor is an intent to impair loyalty and discipline negated by the fact that the effort is made in a place commonly used for innocuous gossip and social conversation. Schoborg v United States, 264 Fed 1 (CA6th Cir) (1920), certiorari denied, 253 US 494, 64 L Ed 1029, 40 S Ct 586 (1920); United States v Dembowski, supra.

The accused's declarations can reasonably be construed differently from the construction accorded them by his counsel. They propounded a racial doctrine that contemplated not merely separation and lack of cooperation between the races, but violent confrontation. The declarations were addressed directly and specifically to members of the accused's race who were members of the Marine Corps. The listeners were engaged in training that would qualify them for transfer to, and participation in, the war in Vietnam. That war was constantly called a white man's war, and a war in which blacks should not fight. Blacks were enjoined to remain in this country to fight whites for black causes. To that end, the accused proposed to his listeners that they join in a mass mast as a means of effecting their discharge from the Marine Corps.

Appellate defense counsel and the amicus curiae contend that the accused's exhortation to join in a mass request for a mast was a call for lawful action. A request for mast is unquestionably lawful, but the court-martial could reasonably conclude that the accused's call was not a call for the exercise of a lawful right for a lawful purpose. There is no evidence the accused knew or honestly believed that Jones, or his other listeners, had independent reasons to request mast. There is an abundance of evidence to support a conclusion that the accused urged Jones to join the mass request for mast because blacks were obligated not to serve in the Vietnam war because it was a white man's war.

**534**

The court members were entitled to weigh all the circumstances, and the reasonable inferences to be drawn from them. They could reasonably conclude that the accused's exhortations to Jones and his call for action in the form of a mass mast was a subtle and skillful way of leading the black troopers in the company into insubordination and disloyalty. Considering the totality of the accused's declarations and the circumstances in which they were uttered, we are satisfied that the court members could find beyond a reasonable doubt that the accused's declarations were intended to interfere with or impair the loyalty, morale, and discipline of Jones.

Turning to whether the accused's activities presented a clear and present danger which could bring about insubordination and disloyalty, the evidence demonstrates that propagation of the accused's theses occurred at a time when Jones and other blacks in the company were undergoing training to prepare them for duty in Vietnam. The accused had been informed that many persons in the company "didn't want to be there" and they were a particularly "susceptible" group. He also knew that the blacks in the company were "aware" of race riots in some of the large cities and were sensitive to the tensions between blacks and whites. Knowing these things, he spread the doctrine that the Vietnam war was a white man's war and blacks could not and should not fight there but remain at home to "fight." The joinder of the Vietnam war with racial violence in the cities was not mere rhetoric or political hyperbole, but a call for refusal of duty. The call was accompanied by the presentation of an alleged means of practical achievement of the objective without penalty. The means proposed by the accused did not contemplate reliance upon the ordinary and the usual reasons for separation from the service or excuse from duty but depended upon the implied force of the number of blacks who availed themselves of it. The aggregate of the accused's activity was not a trivial hazard but a clear and present danger to impairment of the loyalty and obedience of Jones and other blacks in the company. We conclude, therefore, that the evidence satisfies the objective requirement of 18 USC § 2387, as propounded by the Supreme Court of the United States in Hartzel v United States, supra, and amply supports the findings of guilty of specification 1 of the charge.

The remaining seven specifications involve other statements and other persons exhorted by the accused not to go to Vietnam. There are some differences in the content of the declarations. Specification 5, for example, alleges that the accused called Private First Class J. C. Griffin an "'Uncle Tom' for wanting to go over to Vietnam and fight." The amicus curiae contend that the expression is no more than a pithy epithet which "cannot be deemed" sufficient to incite others to illegal actions. Evidence, however, indicates that the term "Uncle Tom" was understood as insult or derision. In appropriate circumstances, insult, derision, or coarse epithet can be as effective a cause of insubordination, disloyalty, and refusal of duty as direct incitement. Schaefer v United States, 251 US 466, 478, 64 L Ed 360, 40 S Ct 259 (1920); Seebach v United States, 262 Fed 885 (CA8th Cir) (1919). Other statements are attacked as too trivial to incite to disloyalty or insubordination. Specification 4, for instance, alleges, in part, that the accused urged Private R. L. Burwell to "disobey the order of his platoon sergeant to get a hair cut." This allegation is viewed as "too ludicrous to be worthy of the consideration of this court." By itself, the allegation may indeed be insignificant, but other averments and proof indicate the accused exhorted Burwell to get out of the Marine Corps because it was a "white man's outfit"; that he should "refuse to go to Vietnam" because there was "no need" for

**535**

him to fight the white man's war; that Burwell should request mast to refuse to fight in Vietnam; and if all the black troopers "stick together" and request mast, they "could probably get out" of the Marine Corps because "the Captain didn't want us to start a riot in the service." From all the evidence, the court-martial could reason that urging Burwell to disobey the order to get a hair cut was an integral part of accused's intention and effort to influence Burwell to disobedience and disloyalty.

As in the case of Jones, the accused's declarations to other blacks ultimately failed in their █ intended purpose. The failure did not immunize the accused from prosecution. Schenck v United States, 249 US 47, 63 L Ed 470, 39 S Ct 247 (1919); Dennis v United States, 341 US 494, 509, 95 L Ed 1137, 71 S Ct 857 (1951). On consideration of the record, we are satisfied that the evidence is legally sufficient to support a conclusion that the accused's conduct was intended to impair the loyalty, morale, and discipline of the persons mentioned in the specifications and that there was a clear and present danger that disloyalty and insubordination would result from his activities.

Determination of the legal sufficiency of the evidence from our viewpoint does not necessarily mean the triers of the facts found the same facts and drew the same inferences. The only way we can be certain they reached the same ultimate conclusions is to consider the instructions they were given as to the facts they were required to find to return findings of guilty.

Prompted by questioning by the Court on argument of the appeal, appellate defense counsel have filed a supplemental brief challenging the sufficiency of the instructions. Relying upon Yates v United States, 354 US 298, 1 L Ed 2d 1356, 77 S Ct 1064 (1957), appellate defense counsel contend that whether the accused's declaration had the natural and probable

536

tendency to generate the kind of action prohibited by 18 USC § 2387, is a question of fact for the court members. Yates dealt with 18 USC § 2385. The two sections deal with the same general subject, but whether the rationale of Yates applies to conduct violative of section 2387 need not detain us.

Hartzel v United States, supra, 322 US, at pages 686–687, specifically held that one of the "elements" of section 2387's predecessor statute was whether the alleged activities presented a "clear and present danger" that they would "bring about the substantive evils" prohibited by the statute. It determined that this "objective" element and the "subjective" element of the accused's intent to cause insubordination must both be "proved by the Government beyond a reasonable doubt." The district judge's instructions at the trial covered both elements of the offense as follows:

". . . Now, the two things must concur, and it must appear that the publication was calculated to have that effect, and that the defendant intended it to have that effect.

"Now, you are to determine whether the publications were calculated to have that effect from the publication itself, it is for you to determine whether these publications, the language used in these publications, was calculated to have that effect, and then you will have the question of intent. I might say in this connection, I might, in describing the limitations on free speech, I might use the language that was used by Justice Oliver Wendall Holmes: He said: 'The question in each case is whether the words used are used under such circumstances or of such a nature as to create clear and present danger that they will bring about the effect that Congress has a right to prevent.'

"That is the rule that you must apply in determining whether these publications were calculated to have that effect, as to whether the words

used in these publications are such, or were used under such circumstances or were of such a nature as to create a clear and present danger that they would interfere with enlistment or recruiting or . . . would cause insubordination in the army, because then they are prohibited by the statute that I have read to you.

"Then there is a question of intent. It is charged in the indictment they were intended to produce those results. In determining whether they were used with that intent, you will take into consideration all of the circumstances in the case, and you must take into consideration the words used, and ·whether from the words used themselves you could find that there was such intent, and you are at liberty to infer that, to take into consideration the language used, the intention and the probable result of such language used, you are at liberty to infer that from all of the facts and circumstances that you have heard testified to here in the evidence, the circumstances under which they were issued." [Transcript of Record filed with the Supreme Court of the United States, No. 531, October Term 1943.]

On the appeal before the Supreme Court of the United States, the Government conceded that the trial judge had properly submitted to the jury the question of the tendency of the defendant's activities to cause insubordination or disloyalty. In its brief, at page 18, it said:

"*Clear and present danger.* The jury found that the petitioner's acts during time of war constituted a clear and present danger of causing disloyalty, refusal of duty, or insubordination in the armed forces. As Mr. Justice Brandeis observed in Schaefer v United States, 251 US 466, 483, 'because it is a question of degree the field in which the jury may execise its judgment is, necessarily, a wide one', though the duty rests on the courts to withdraw the case from the jury if 'men,

judging in calmness, could not reasonably say that (the words) created a clear and present danger that they would bring about the evil which Congress sought and had a right to prevent'. We submit that the trial court properly left the issue to the jury."

Pierce v United States, 252 US 239, 244, 64 L Ed 542, 40 S Ct 205 (1920), which involved a conspiracy to cause insubordination and disloyalty and a substantive count of attempting to cause insubordination and disloyalty under the predecessor statute is to the same effect. Rejecting a contention that a demurrer to the indictment should have been sustained, the Supreme Court said: "Whether the statements . . . had a natural tendency to produce the forbidden consequences, as alleged, was a question to be determined not upon demurrer, but *by the jury at the trial.*" (Emphasis supplied.) We conclude, therefore, that the instructions in a prosecution of this kind must advise the court members, as triers of the facts, that they must find beyond a reasonable doubt that the language and the circumstances of the accused's declarations presented a clear and present danger that those declarations would cause insubordination, disloyalty, or refusal of duty. With this requirement in mind, we turn to the instructions in this case.

During an out-of-court hearing on proposed instructions, trial counsel raised the question of the likelihood of the accused's conduct to create insubordination and disloyalty. He noted his belief that the circumstances under which the accused's statements were made could be considered in determining the "apparent present danger." He also called attention to evidence that the accused's listeners were persons "about to complete their training to go to Staging Battalion," which would be their last duty station in the United States before going to Vietnam. However, the law officer rejected trial counsel's remarks with the comment that this evidence went to "the gravity of the offense rather

**537**

than to the element of the offense." As a result, the instructions make no mention of the tendency of the accused's activities to produce the prohibited results as an element of the offense. Thus, the court members were entirely uninformed on a matter essential to determination of the accused's guilt or innocence. This serious instructional deficiency requires reversal of the findings of guilty of a violation of section 2387. United States v Rhoden, 1 USCMA 193, 2 CMR 99 (1952); United States v Soukup, 2 USCMA 141, 7 CMR 17 (1953).

An out-of-court hearing at the close of the defense case provides the subject matter for the accused's final assignment of error. The last defense witness was Private First Class J. L. Honesty. In his testimony, Honesty had referred to a pretrial statement he had made in connection with the mass mast, and he indicated his "attitude" changed later when he went on leave and talked to members of his family. He denied that he had previously said he did not want to fight the white man's war in Vietnam. When Honesty concluded his testimony, the law officer excused the court members and held the out-of-court hearing. He noted that, while Honesty had been testifying, he had read Honesty's pretrial statement, which was included in the Article 32 Investigation Report that counsel had given him at the beginning of trial and which had been referred to during the trial. The law officer stated that he was "highly disturbed" by what he had read and that he would "not be a party to anything even remotely" connected with certain remarks in the statement. He indicated he would "direct [the trial] counsel to pursue" the matter. However, after some colloquy, in which defense counsel argued that Honesty's statement reflected his own "feelings and opinion" and "never implicated" the accused, the law officer acknowledged that he was not "an advocate in the case" and that "perhaps . . . [he had been] a little carried away . . . [by] the situation." He re-

iterated that he was "profoundly shocked" at parts of Honesty's statement, but he terminated the out-of-court hearing. Later, at another out-of-court hearing after the luncheon recess, the question of a mistrial was raised. Defense counsel indicated he had no "desire to make" any such motion.

Inasmuch as the accused affirmatively disclaimed any desire to inquire into the effect of the incident on the law officer's qualification to function impartially during the remainder of the trial, it may now be too late to press the incident as ground for reversal. United States v Law, 10 USCMA 573, 28 CMR 139 (1959); United States v Weaver, 9 USCMA 13, 25 CMR 275 (1958). Apart from waiver of the right to object to the law officer's remarks, no reasonable risk of prejudice to the accused from the incident appears in the record. The law officer's concern was with Honesty's veracity, not with the accused's guilt or innocence. Nothing in the incident reflects adversely upon the impartiality and fairness he demonstrated throughout the trial. His remarks were not known to the court members, and Honesty was never examined in open court on the contents of his statement. Appellate defense counsel insist that disregard of the incident will result in a miscarriage of justice. See United States v Russell, 15 USCMA 76, 35 CMR 48 (1964). We have scrutinized the record but find no indications of bias or prejudice on the part of the law officer which even hint at an "appearance of evil." Certainly, the law officer was impetuous and injudicious in his comments on Honesty's personal beliefs, but his loss of composure was temporary and unknown to the court members. The incident may be regrettable, but it does not amount to reversible error. United States v Lindsay, 12 USCMA 235, 30 CMR 235 (1961).

We turn now to the nature of the relief to be accorded the accused because of the instructional error noted

earlier. In the companion case of United States v Harvey, 19 USCMA 539, 42 CMR 141, decided this date, we dealt with the same issue. We determined that some of the findings of guilty were not affected by the error and could properly be affirmed as a lesser included offense.

In *Harvey*, we assumed but did not decide that the statements set out in the specifications were disloyal to the United States. Some of the statements in this case are like those in *Harvey*; others, such as the statement to Private Burwell to disobey an order to get a haircut, are not. As in *Harvey*, however, we need not determine whether the statements are disloyal to the United States as a political entity. The findings of guilty of section 2387 treat the statements as conduct the *effect* of which could impair the obedience or loyalty of particular persons; they do not explicitly indicate that the statements as such disavow allegiance to the United States. Depending upon the circumstances, reasonable persons might reach different conclusions as to the nature of the statements; thus, the question is essentially one of fact for fact finders, rather than one of law for this Court. However, as in the *Harvey* case, "the court-martial's findings indicate, as a minimum, that the accused solicited a member of the Marine Corps to commit a military offense." Considering the time that has elapsed since the, accused's trial, we deem it appropriate to affirm those findings rather than continue the proceedings by ordering a rehearing on the charges on which the accused was arraigned.

The decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Navy for submission to the United States Navy Court of Military Review for reassessment of the sentence upon the basis of the approved findings of guilty.

Judge DARDEN concurs.

Judge FERGUSON concurs in the result.