**UNITED STATES**

v.

**Richard John BESSETTE, 061 38 3060, Chief Warrant Officer–2 (W–2), U. S. Marine Corps.**

**NCM 77 1162.**

U. S. Navy Court of Military Review.

Sentence Adjudged 20 Dec. 1976.

Decided 13 Jan. 1978.

LT Lawrence W. Muschamp, JAGC, USNR, Appellate Defense Counsel.

LT Christine M. Yuhas, JAGC, USN, Appellate Government Counsel.

Before NEWTON, Senior Judge, and GLADIS and GRANGER, JJ.

GRANGER, Judge:

Chief Warrant Officer 2 Bessette was convicted of stealing and wrongfully selling Government property on two occasions, and stealing and attempting to sell Government property on another occasion. He was sentenced to dismissal from the Naval service.

He was the Launch and Recovery Officer for MABS–13, a subordinate squadron of Marine Air Group 13, 3d Marine Aircraft Wing at Marine Corps Air Station, El Toro, California. In early 1976, he was instructed by his squadron commander to arrange through the Wing SATS Officer or, in his absence, the Wing SATS Chief, to dispose of scrap aluminum matting in the squadron area.

Rectangular sheets of aluminum matting, 2 feet wide, either 6 or 12 feet long, and about 2 inches thick, are interlocked to form aircraft runway surfaces. Each 2 × 12-foot sheet weighs about 144 pounds. Bent, torn, or otherwise deteriorated matting can no longer serve its primary purpose, but is useful as hard surface for equipment storage, bulwark for excavations, and pathways in muddy areas, among other possible uses. It would rarely have no utilitarian value to the Marine Corps.

Because of the high cost of such matting, its disposal is strictly controlled. Permission to dispose of scrap matting must be obtained from the Naval Air Systems Command (NAVAIRSYSCOM), the responsible Governmental agency. The request for such authority originates with the squadron, is forwarded via the group and wing commander, through Headquarters, Marine Corps, then to NAVAIRSYSCOM.

The persons on the 3d Marine Aircraft Wing staff having cognizance of disposal procedures and who advise and assist subordinate military organizations in these matters are the Wing Engineer and his subordinate, the Wing SATS Officer. Both of these officers testified, as did the Launch and Recovery Maintenance Officer from another squadron. All testified that alumi-

num matting should not be disposed of without permission of NAVAIRSYSCOM.

Appellant testified that, shortly after assuming duties as Launch and Recovery Officer in April 1975, he had become aware that a civilian junk dealer frequently came aboard the air station and picked up scrap metal, and he had contacted the Wing SATS Officer who told him that giving scrap material to this dealer was a legitimate way to dispose of it.

Almost 1 year later, confronted with the problem of disposing of the aluminum matting, he discussed the situation with his noncommissioned officer-in-charge and a newly-arrived noncommissioned officer who was replacing this NCOIC. Material turned in to the local on-base military salvage unit had to be palletized and administratively processed. This preparation consumed time and manpower he could ill-afford. On the other hand, he reasoned, he did not want to give the scrap aluminum to the civilian dealer, George the junkman, because he preferred that any profit derived from this material benefit military personnel in his organization. His NCOIC suggested taking the matting off base and selling it to a different civilian dealer.

Appellant discussed this matter with his roommate, a noncommissioned officer experienced in the supply field, who told him the Group Supply Officer had sold some scrap paper material and used the proceeds for the squadron coffee mess fund. Appellant confirmed this by calling the Group Supply Office and receiving the same information from a sergeant working there.

After these inquiries, appellant approved the plan of his NCOIC, which was that two civilians would come aboard the station in a rented civilian truck, pick up the matting, and sell it in the civilian community for approximately 17 cents per pound.

On 20 May 1976, these plans were carried out. Almost 9,000 pounds of matting were taken off base and sold for $1,776.00. The proceeds were divided, with roughly one-fifth going to each civilian and the NCOIC, and two-fifths to appellant, one-fifth of which was intended for the coffee mess fund. The incoming NCOIC was given $100.00 by appellant.

On 3 June 1976, this operation was repeated, with the assent of appellant, and 9,870 pounds of matting were sold for $1,974.00. Later the same day, a third load of matting was intercepted, en route to the civilian dealer, by law enforcement officers. This matting weighed 9,782 pounds.

The evidence against appellant was compelling. His sworn confession was introduced in which he detailed the plan to have two civilians take the matting off base and sell it; described that the money would be split between some civilians, his NCOIC and himself; told of giving part of the proceeds to another member of his command who was aware of the transaction, but who shortly gave the money back to appellant "because he said his conscience was bothering him and he did not want to be involved"; and told of being approached by other men in his command who knew of the first sale and "wanted to help in any future deals and that they wanted a share of the profits." His confession concludes:

I knew that the matting was government property and I knew that we were stealing that property. I did not think that it was very serious because the matting was being disposed of anyway.

On the 18th or 19th of May, I was aware of a plan to steal some excess U. S. Government property in the form of aluminum matting from the MABS–13 area at MCAS El Toro, California. On 20 May 1976, I was aware of the theft of this property and I received $430 as my portion of the sale of the matting. I gave $100 of this to SGT YOUMANS, and on 28 May 1976, I deposited $430 in my checking account at Santiago Bank, Tustin, Ca as SGT YOUMANS had given me back the $100. On 2 June 1976, I was aware of the theft of another quantity of matting which was planned from [sic] 3 June 1976. On 3 June 1976, I was aware that the theft was taking place of aluminum matting and I observed some of it being loaded on a truck. I knew the matting was government property and I

knew we were stealing that property. I do not know how much I was going to get today.

Appellant's confession was amply corroborated by one of his own witnesses, who was a principal in these crimes, and by a Government witness. The latter described how the proceeds were to be broken into fifths, with one-fifth going to each of two civilian confederates, one-fifth to the military confederate, one-fifth to appellant, and one-fifth to the unit coffee mess fund. Testimony of another witness supports this division of the profits.

Appellant testified on the merits and attempted to discount incriminating portions of his confession as the work of law enforcement officers putting words in his mouth. The theory of his defense was that he participated in the taking and sale of the property, but he was not criminally responsible because he believed what he did was lawful and therefore lacked the requisite criminal intent. His belief was predicated upon the information he received that the Group Supply Officer sold some scrap paper to a civilian firm and used the proceeds to maintain the organization's coffee mess. He did not testify that he was told this procedure was lawful, or that anyone told him he was authorized to sell scrap material to anyone. He reasoned, however, that the Group Supply Officer possessed expertise in this area and this officer had placed his imprimatur on that method of disposal; consequently, such disposal must be permissible.

Staff Sergeant Englert, appellant's former roommate who was not associated with these offenses, testified that he had extensive experience in the supply field; that appellant asked his advice as to how the matting could be disposed of; and that, during that conversation, he told appellant that he should contact the Group Supply Officer, because IBM paper and data processing cards had been sold and the proceeds used to support the coffee mess fund.

Appellant testified he did not know how much was received for the matting, and he did not know that the proceeds of the sale had been divided into fifths. He did not know how much his NCOIC took out of the proceeds, and he thought the two civilians received $100.00 each for the transaction on 20 May. He further testified that he did not intend to profit from this venture, and that the money he received was for the unit coffee mess fund. He put this money in his personal checking account for safe keeping.

To support his defense that he believed what he did was proper, appellant sought to introduce proof that what he heard was true; that is, that the Group Supply Officer actually had sold scrap material to civilians and used the proceeds for the squadron welfare fund. The trial judge refused to admit into evidence a written statement of the Group Supply Officer in which these facts were admitted. Appellant contends that the exclusion of this statement was reversible error.

The statement of the Group Supply Officer described how waste paper was sold to a civilian concern and the proceeds placed in a special squadron bank account and expended only for troop morale in augmentation of special services funds. Disbursements had to be authorized by Squadron Headquarters and all checks drawn and signed by the Group Supply Officer. The sale of the paper was authorized by the squadron commanding officer.

Whether such evidence is admissible is a close legal question. The theory of appellant's case was that he lacked criminal intent because he believed what he did was lawful. His belief was predicated upon what he heard, not what he knew. Whether the Group Supply Officer actually sold Government property has no direct bearing on whether appellant believed he did. Cases in other jurisdictions have held such evidence inadmissible.

In *People v. Hurtado*, 63 Cal. 288 (1883), the wife of a defendant charged with murder testified that she had confessed to her husband that she had been guilty of adultery with the deceased, and that this had great emotional impact upon the defendant. To corroborate the fact that his wife had told him of her adultery with the deceased,

the defendant offered evidence tending to prove the adultery. The court refused to permit the evidence, stating that evidence that she had committed adultery would not tend to prove she confessed to her husband that she had committed adultery.

*People v. Webster*, 139 N.Y. 73, 34 N.E. 730 (1893) is another homicide case. The justification was self defense. Defendant's wife testified that just before the killing she told her husband the deceased had made improper advances toward her. The court permitted evidence of what she had told her husband, but would not permit proof of what actually transpired between the wife and the deceased, stating that the only material thing was the communication, and it was entirely immaterial whether the things disclosed actually happened. This reasoning was quoted with approval on appeal.

*See also* some of the cases cited in II Wigmore on Evidence § 263 at 84 (3d ed. 1940), which hold that the prosecution may not prove the *nonexistence* of facts allegedly communicated; *General Dynamics Corp. v. SELB Manufacturing Company*, 481 F.2d 1204 (8th Cir. 1973); and the military cases of *United States v. Voorhees*, 4 U.S.C.M.A. 509, 544, 16 C.M.R. 83, 118 (1954) (dissenting opinion) and *United States v. Skeen*, 16 C.M.R. 754, 757 (A.F.B.R.1954) (general discussion).

Dean Wigmore points out that the objective truth of the fact reported may be relevant when the nonexistence of the fact is offered as tending to show that the witness testifying to the communication of the alleged fact is not testifying truthfully:

> For example, on a prosecution for murder, the defence being insanity caused by brooding over the deceased's persistent pursuit of the virtue of the defendant's wife, suppose that the defendant's wife testifies in his behalf to numerous reports, made by her to the defendant, of the deceased's attempts to seduce her; now if it could be shown indubitably that such attempts upon the witness never took place, would this not make it less likely that the alleged communications of them were made by her? [II Wigmore, *supra*.]

*See also Knapp v. State*, 168 Ind. 153, 79 N.E. 1076 (1907).

There is a distinction between offering the *nonexistence* of a fact as evidence tending to refute the assertion that the fact was communicated to another, as in Dean Wigmore's example above, and offering the *existence* of a fact as evidence tending to support the assertion that the fact was communicated, as was done in this case and in *Hurtado* and *Webster*, both *supra*. The latter evidence would seem to have less probative value. It is, nevertheless, more likely that one inquiring whether a fact exists will receive an affirmative answer if the fact really did exist.

Relevant evidence is defined as evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed.R.Evid. 401; *see United States v. Boyd*, 7 U.S.C.M.A. 380, 384, 22 C.M.R. 170, 174 (1956). Evidence that the Group Supply Officer had, in fact, sold scrap material to civilians tends to make it more probable that others told appellant of this when he inquired about it; which tends to make it more probable that appellant believed the Group Supply Officer did this; which gives rise to the inference that if the Group Supply Officer did it, it was proper; which supports appellant's defense that he lacked the requisite criminal intent because he believed his action was legal. Despite the old case law to the contrary, we therefore find that the Group Supply Officer's statement was relevant. We have found it necessary to analyze this issue at some length in order to establish that the evidence at issue is weak, circumstantial evidence of very little probative value and is relevant solely as tending to prove a remote point, several steps removed from appellant's defense. This becomes important in assessing the record to determine whether the exclusion of this evidence was prejudicial.

We do not, however, believe that the trial judge erred in excluding the statement of the Group Supply Officer. This was weak

evidence, inferentially corroborating appellant's testimony that was already corroborated by strong, direct evidence in the form of Staff Sergeant Englert's testimony discussed above. It was cumulative, at best. Its probative value was substantially outweighed by the danger that it would confuse the issues and induce a verdict on a purely emotional basis: It is not unlikely that the members would have concluded from this evidence that, if another had broken the law and gone unpunished, appellant should not be convicted or punished either. The statement was not admissible for this purpose. As this Court stated in *United States v. Purcell*, No. 72 1457 (N.C.M.R. 19 Sept. 1972) (slip opinion at 3):

> It is now virtually hornbook law that sentences awarded in other cases are inadmissible in a case then at bar since an accused should not be measured by another person's criminal conduct. . . . *United States v. King*, 12 U.S.C.M.A. 71, 30 C.M.R. 71 (1960). It would be even less appropriate to bring to the attention of the court administrative determinations in the disposition of similar cases.

*See also United States v. Voorhees* and *United States v. Skeen*, both *supra*. The trial judge could properly exclude such remote, confusing, misleading and cumulative evidence, Fed.R.Evid. 403, and we hold that he committed no error when he did so.

Conceding, *arguendo*, that the statement should have been admitted, its exclusion was harmless error.

The proffered evidence merely tended to show that appellant had heard of the Group Supply Officer's activities. Accepting that as a fact, the evidence overwhelmingly refutes his lack of criminal intent. His sworn confession admitted his criminal complicity and mentions nothing about his belief that what he did was legal. The confederacy with the civilians, the use of a rented civilian truck, the division of the proceeds, the gift of $100.00 to another who was aware of the transaction, the return of this money— all these facts tend to show that this was not the work of individuals who considered this proper military activity.

Appellant places great importance upon his inquiries into disposal practices prior to his approval of the plan. His investigation tends to support his guilt rather than his innocence, however. Although the record shows that he frequently sought technical advice from the Wing Engineer's Office, on this occasion appellant did not ask if his scheme was lawful and permissible. He did not seek authority to sell the matting. He merely inquired into the Group Supply Officer's activities. He sought advice not from the officers officially cognizant of such matters, but from enlisted men with no authority to give him the permission he needed. His efforts comport more closely with the conduct of one seeking an excuse to knowingly break the law, rather than one earnestly trying to avoid such transgressions.

Appellant is a warrant officer with over 10 years military experience and a GCT of 132. His testimony that he did not know of the distribution of the proceeds or the amount of money received for the matting is difficult to believe. If his sense of duty as officer-in-charge of this operation would not lead him to inquire as to these matters, normal curiosity should.

Considering all the evidence, it substantiates the truth of appellant's confession and refutes his asserted defense. The evidence of his guilt is overwhelming. The evidence which was excluded was circumstantial evidence from which only a weak inference could be drawn. There was direct evidence on this same point, not only in the form of appellant's testimony, but also from a witness unconnected with these offenses. The Government did not contest appellant's assertion that he had heard that the Group Supply Officer had sold scrap material to civilians.

Further, owing to the contents of the proffered statement, it is likely that it would have done appellant more harm than good. The stark contrast between this command-approved, well-regulated practice which benefited squadron personnel generally and afforded no personal profit, albeit improper, and appellant's patently illegal

operation might well have been damaging to appellant's case.

There is no fair risk that the exclusion of this evidence harmed appellant or led to findings or a sentence different from that he would have received if the evidence had been admitted.

We have examined appellant's other assignments of error and the Government's reply thereto and have concluded that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings and sentence as approved on review below are affirmed.

Judge GLADIS concurs.

NEWTON, Senior Judge (dissenting):

I am forced to enter my dissent for I am unable to agree with the conclusions expressed in the majority opinion, in the following respects:

The evidence is not clear as to the accused's intent regarding the division of moneys received from the sale of the aluminum matting. On prior occasions, the accused had taken his own personal funds and utilized them for welfare purposes for his subordinates. Whether he intended to retain one-fifth of the money from aluminum sales for himself, or to use two-fifths, his full share, for his subordinate's welfare is speculative. The facts do not warrant the conclusion that the former choice was that of the accused. The latter choice is considered an equally logical alternative. Therefore, I do not agree that the accused intended to keep any portion of the money for himself. The record does not support that conclusion with any degree of certainty. I do not find the prosecution evidence to be so compelling toward guilt that the exclusion of the defense proffered statement of Lieutenant Colonel Stoner made no difference in the decision of the court-martial.

I do not agree that exclusion of the Stoner statement, wherein similar offenses are admitted, was proper. The court should have considered that statement. I do not agree that exclusion of the Stoner statement was nonprejudicial to the accused.

I do not agree that the findings and sentence are correct in law or fact, or that the sentence should be approved.

Warrant Officer Bessette is convicted of the theft and wrongful sale of aluminum airfield matting on two separate occasions, and of the theft and attempted sale of additional matting a short time later. Articles 80, 108 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 908 and 921, are the statutory offenses charged and found. Mr. Bessette was sentenced to dismissal from the service. He appeals, making the following assignment of error, *inter alia:*

THE TRIAL JUDGE ERRED TO THE MATERIAL PREJUDICE OF THE ACCUSED IN REFUSING THE ADMISSION INTO EVIDENCE OF LIEUTENANT COLONEL STONER'S WRITTEN STATEMENT.

An overview of the record of trial shows the accused was party to the theft of about 200 sheets, 28,000 pounds, of aluminum airfield matting in the possession of the unit under his charge. All but about 10,000 pounds of the matting was sold in the civilian community at a rate of about 20 cents per pound. The proceeds were to be divided between two civilian truckers, a noncommissioned officer serving under the accused, and the accused. The culprits were apprehended before the last sale of matting was perfected and some of the proceeds of sale were divided.

Rectangular sheets of aluminum matting, 2 feet in width by either 6 or 12 feet in length and about 2 inches thick, are used by Marine Corps air units as airplane runway surfacing. Each $2 \times 12$-foot sheet weighs about 144 pounds. The sheets are constructed so that they interlock to provide a firm one-piece runway surface. Use of the aluminum matting for the noted purpose results in deterioration of the sheets. That deterioration may be caused by jet blast,

hard blows, and bending due to softening of subsurface foundation, weight bearing, and weathering. If the matting becomes bent or torn, or otherwise deteriorated, it may no longer be of value as a runway surface. In that case, it may be used to provide such things as a hard stand for equipment storage, as bulwark in excavations, and as pathways in muddy areas. Possessory control of and accountability for the matting is rather strictly limited due in part to its expensive and unique nature. Rarely, the matting may become unusable. In that event, it is to be disposed of in the best interests of the Government; for it is Government property no matter its condition. Storage of deteriorated matting may present a problem if it is stored in an airfield area—it may be unsightly and it may be a safety hazard.

In addition to aluminum matting, a Marine airfield uses certain wire cable, nylon line, and nylon webbing in launching and recovering airplanes. Useful life of that equipment is limited by time, weather, and wear factors. After certain usage, the equipment becomes unsafe or unserviceable—it must then be disposed of by responsible authorities. Assuredly, it is not left to pile up near operational areas.

Little imagination is needed, given the above comments, to foresee an air station becoming a magnificent junk pile of worn, unsafe, and unsightly material unless that material is removed. It is obvious that some used material may be valueless, while other portions of the material may have substantial value, e. g., as scrap metal. Further, it is noted that certain regulations exist as to the packaging of scrap material which is to be turned in to military salvage activities for disposition. For example, wire cable must be sawed into certain lengths—in some cases that cable must be cut into several hundred pieces—and banded together into bundles. The unit desiring to be rid of the unusable material is normally responsible for packaging and delivery of the material to a disposal activity at the expense of considerable labor. As a consequence, it is not surprising that certain scavenging practices arise. It is easier to allow an unofficial disposal of waste material of minimal or no value by obtaining a junkman to haul it away at no cost. The latter practice seems to have become an accepted procedure by some personnel at the activity where the accused found himself on duty.

The accused was told by his commanding officer to dispose of certain material, including used aluminum matting, in his area. He inquired as to appropriate disposal procedures. He was told to place the aluminum on pallets to turn it in. The accused was also aware that scavengers were hauling some material away with the apparent approval of superiors, or at least in accordance with custom in force several years. The record shows a long period, consistent visitation by civilian non-contract junkmen to haul away unwanted trash from the squadron area. The appellant sought advice from friends, higher authority—the Air Group command—and from his noncommissioned officer staff. The latter worked out an arrangement whereby the matting would be hauled away in a civilian truck and sold. The proceeds were to be divided between the civilian truckers, the non-commissioned officer, and the appellant. That arrangement gave rise to the charges.

The above practices contravene proper disposal procedures for Government-owned property. It may save time and effort of personnel, but it ultimately results in the circumstances shown here—sooner or later the determination as to whether used material has some value to the Government becomes warped beyond the margins of the appropriate exercise of discretion. Greed and potential profit enter into the consideration afforded to the disposal decisions.

The accused, in defense of his action, indicates he intended to use his share of the proceeds of sale of the aluminum to establish a welfare fund for the personnel for whom he was responsible—denying criminal guilt for that reason, because he knew other officers had done essentially the same thing and he thought it was an appropriate procedure. His intent was to remove the unusable material as he had been directed to do,

at the same time precluding profit by scavengers and obtaining money for troop welfare by imitating the common practice. The accused's theory of defense was that it was a practice at the command to sell waste material and utilize the proceeds of sale to promote troop welfare. He maintained he had made inquiry as to disposal procedures, which resulted in his discovery of the foregoing practices.

The record shows that a Major and Lieutenant Colonel sold waste computer paper in the civilian market to augment a squadron recreation fund. The accused was told of that practice. The evidence of record shows that the accused had inquired as to proper disposition procedures for scrap without receiving much but erroneous guidance, prior to commission of the noted offenses. The record also shows that at least three individuals in positions of authority over the accused concerning disposition of property, and in the next superior command to the accused's, have refused to testify as to their scrap-material disposition practices. The court members were properly left unaware of their refusal to testify.

The statement at issue indicates Lieutenant Colonel Stoner, then a Major, had sold Government-owned waste computer paper to a civilian business and used the sale proceeds in a unit welfare fund. That procedure was with knowledge of the responsible commanding officer. The value attributed to the statement was a showing that the appellant, in his acts of selling Government-owned aluminum, was merely following common practice as shown by Lieutenant Colonel Stoner's lead, to obtain welfare funds for unit use (Government benefit) by sale of junk which would otherwise be thrown away or hauled off by a junkman. At trial, Lieutenant Colonel Stoner invoked his right to remain silent concerning his sale activities. Nevertheless, it does appear Colonel Stoner was acting as a staff officer on a staff immediately superior to the command to which accused belonged at the time of sale of the paper and that he was responsible for disposition of such property. Further, it appears that the accused called the Colonel's office seeking advice on disposal procedures.

The military judge refused to allow the court to consider the Stoner statement. The reasons:

a. It is hearsay.
b. It involves a different event.
c. It is not under oath.
d. Appellant's testimony as to his basis for selling aluminum has not been attacked.
e. It is remote.
f. It is not relevant. (See R. 418, 419).

That evidence consisted of an admission by a third person (officer) that he had committed similar practice at about the same time, at the same activity, and for a similar purpose. Although such evidence is ordinarily inadmissible because it lacks relevancy and is remote in character, 22A C.J.S. Criminal Law §§ 622, 683, 691(9)b (1961), it is thought to have been relevant and admissible in the instant case. That evidence corroborated other defense evidence and testimony. It tended to strengthen the credibility of accused's testimony. Further, that evidence lent credence to the accused's defense that he lacked a wrongful intent, mens rea, and a specific criminal intent to deprive the Government of the use and benefit of its property in that he considered his acts authorized, or at least in consonance with generally accepted practice at the time. (See R. 311, 468). Exclusion of the evidence worked substantial prejudice on the accused. I am unable to conclude the court would have found the accused guilty had it heard the excluded statement.

The proffered statement bears directly and ultimately on the existence of criminal intent on the accused's part. It was relevant in that context. MCM, 1969 (Rev.), para. 137; Fed.R.Evid. 401. The declarant witness was unavailable because of his refusal to testify. The statement was contrary to the declarant's penal and proprietary interests. The statement was made in the course of an official investigation. It is of an exculpatory nature to the accused. It appears to have been made after proper warnings were given. It corroborates ap-

pellant's defense. It shows a common practice by superior authority. The statement is considered to be admissible as evidence. Corroborating circumstances clearly show it to be trustworthy. *United States v. Johnson*, 3 M.J. 143 (C.M.A.1977); Fed.R.Evid. 804. By exclusion of the statement, the court was denied the opportunity to consider all competent evidence in behalf of the accused. That denial was substantially prejudicial to the accused because it would have corroborated his testimony and theory of defense. Exclusion of the statement prevented that corroboration. Whether the court members would have believed that evidence or theory is of no consequence to this disposition. The accused should have been allowed to use the evidence. *United States v. Schmidt*, 16 U.S.C.M.A. 57, 36 C.M.R. 213 (1966); *United States v. Doyle*, 3 U.S.C.M.A. 585, 14 C.M.R. 3 (1954); *United States v. Skeen*, 16 C.M.R. 754 (A.F.B.R. 1954). *But see United States v. Voorhees*, 4 U.S.C.M.A. 509, 544, 16 C.M.R. 83, 118 (1954) (Brosman, J., dissenting). It cannot be said that this evidence would not have resulted in different findings by the court. Doubt must be resolved in favor of the accused.

I consider the third assigned error to have substantial merit, as noted. I find the exclusion of the Stoner statement was substantially prejudicial to the rights of the accused inasmuch as he was precluded from providing weighty evidence to buttress his theory of defense.

Additionally, I must note that if, as my brothers assume, the findings are correct, this Court has not met its responsibility to assure some equality of punishment in the military justice system. I believe the sentence is unduly severe in light of the punishment meted out in similar cases noted in this record. *United States v. Palenius*, 25 U.S.C.M.A. 222, 54 C.M.R. 549 (Interim), 2 M.J. 86 (1977).

I find the remaining assignments of error to be without merit.

I would set aside the findings and sentence and authorize a rehearing.