UNITED STATES, Appellee

v.

Jeremy T. WILCOX, Private First Class
U.S. Army, Appellant

No. 05-0159

Crim. App. No. 20000876

United States Court of Appeals for the Armed Forces

Argued April 10, 2008

Decided July 15, 2008

RYAN, J., delivered the opinion of the Court, in which EFFRON, C.J., and ERDMANN and STUCKY, JJ., joined.  BAKER, J., filed a dissenting opinion.


Counsel


For Appellant:  Captain Christopher W. Dempsey (argued); Colonel Christopher J. O'Brien, Lieutenant Colonel Steven C. Henricks, and Major Sean F. Mangan (on brief); Major Scott T. Ayers and Major Tyesha E. Lowery.

For Appellee:  Captain Michael G. Pond (argued); Colonel John W. Miller II and Captain Michael C. Friess (on brief).


Military Judges:  Stephen R. Henley (arraignment) and Robert L. Swann (trial)


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

RYAN, Judge, delivered the opinion of the Court.

The issue before us is whether the evidence adduced at trial demonstrated that Appellant's statements on government, race, and religion were made under circumstances legally sufficient to criminalize his conduct under Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).[1] Under the specific circumstances of this case, we hold that the evidence presented by the Government was insufficient as a matter of law to meet the element of either service discrediting behavior or conduct prejudicial to good order and discipline under Article 134, UCMJ.[2]

---

[1] The granted issue was:

> WHETHER THE EVIDENCE WAS LEGALLY SUFFICIENT TO SUPPORT
> A DETERMINATION THAT APPELLANT'S STATEMENTS TO AN
> UNDERCOVER [CID] AGENT ON THE INTERNET WERE EITHER
> DETRIMENTAL TO GOOD ORDER AND DISCIPLINE OR OF A
> NATURE TO BRING DISCREDIT UPON THE ARMED FORCES WHEN
> THE MILITARY NEXUS REFLECTED IN THE RECORD CONSISTED
> OF APPELLANT'S REFERENCE TO BEING A "US ARMY
> PARATROOPER," AND HIS STATEMENTS RAISE A SIGNIFICANT
> ISSUE UNDER THE FIRST AMENDMENT.

65 M.J. 335 (C.A.A.F. 2007).

[2] We heard oral argument in this case at Malmstrom Air Force Base, Montana, as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

United States v. Wilcox, No. 05-0159/AR

## I.    Background

Appellant's case has wound through the military justice system for almost eight years.  During that time several of the original offenses, which both shared a factual basis with the offense in question today and were central to the Government's theory of the case, were either mooted by the military judge's findings of not guilty or have been modified or dismissed by the United States Army Court of Criminal Appeals (CCA).  This procedural history is important, as it frames the narrow issue presently before this Court.

## A.    Procedural History

Appellant was charged with disobeying an officer, violation of an Army regulation by attending a Ku Klux Klan rally, violation of an Army regulation by wrongfully recruiting other members of the Army in extremist activity, violation of an Army regulation by distributing extremist literature, making a false official statement, larceny of property of some value less than $100, and finally:

> wrongfully advocat[ing] anti-government and disloyal
> sentiments, and encourag[ing] participation in
> extremist organizations while identifying himself as a
> "US Army Paratrooper" on an America OnLine [AOL]
> Profile and advocat[ing] racial intolerance by
> counseling and advising individuals on racist views
> and that under the circumstances, the [Appellant's]
> conduct was to the prejudice of good order and
> discipline in the armed forces or was of a nature to
> bring discredit to the armed forces

3

in violation of Articles 90, 92, 107, 121, and 134, UCMJ, 10 U.S.C. §§ 890, 892, 907, 921, 934 (2000).

Appellant pleaded guilty to disobeying an officer in violation of Article 90, UCMJ, and to stealing a watchband worth $2.99 in violation of Article 121, UCMJ. He pleaded not guilty to the remaining charges.

Appellant was tried by military judge alone and was found not guilty of the Article 92, UCMJ, charges associated with recruiting servicemembers into extremist activity and distributing extremist literature, and guilty of violating Article 92, UCMJ, by attending a Ku Klux Klan rally, violating Article 107, UCMJ, by making a false official statement in which he denied having extremist views, and violating Article 134, UCMJ. Appellant was sentenced to a bad-conduct discharge, confinement for eight months, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority approved the adjudged sentence.

On appeal, the CCA held that the evidence was legally insufficient to affirm the conviction for a violation of Article 92, UCMJ, based on attending a Ku Klux Klan rally in violation of an Army regulation, but affirmed the remaining charges. United States v. Wilcox (Wilcox I), No. ARMY 20000876, slip op. at 2 (A. Ct. Crim. App. Nov. 4, 2004) (unpublished). After this, the only offense remaining that imposed criminal

culpability on Appellant for expressing his views was the Article 134, UCMJ, specification.

This Court initially granted review of Appellant's case to determine whether the Article 134, UCMJ, offense was unconstitutionally overbroad as charged. United States v. Wilcox (Wilcox II), 61 M.J. 462 (C.A.A.F. 2005). After hearing oral argument this Court held that:

> Upon further consideration of the granted issue, we note that many of the facts at issue in the constitutional challenge to the Article 134 offense were at issue with respect to the offenses charged under Article 92. In light of the fact that the closely related Article 92 offenses were resolved favorably to Appellant, it is not apparent which facts were relied upon by the court below for purposes of addressing Appellant's constitutional challenge to his Article 134 conviction. Under these circumstances, we conclude that it is appropriate to remand this case for further consideration of the following by the court below:
>
> (1) The constitutionality of the Article 134 findings. See, e.g., Parker v. Levy, 417 U.S. 733, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974); United States v. Brown, 45 M.J. 389 (C.A.A.F. 1996); United States v. Priest, 21 C.M.A. 564, 45 C.M.R. 338 (1972).
>
> (2) The legal and factual sufficiency of the evidence of the Article 134 findings. See Article 66(c), 10 U.S.C. § 866(c) (2000).

United States v. Wilcox (Wilcox III), 62 M.J. 456, 457 (C.A.A.F. 2006).

On remand, the CCA held that the evidence was "legally and factually sufficient to support appellant's conviction based on the [Article 134 specification], except that part of the

5

specification alleging appellant encouraged participation in extremist organizations."  United States v. Wilcox (Wilcox IV), No. ARMY 20000876, slip op. at 3 (A. Ct. Crim. App. Dec. 22, 2006).  Based on this holding, the specification remaining alleged that Appellant "did, at or near Fort Bragg, North Carolina, between on or about 28 April 2000 and 30 May 2000": (1) "wrongfully advocate anti-government and disloyal sentiments while identifying himself as a 'U.S. Army Paratrooper' in an America Online profile, and advocate racial intolerance by counseling and advising individuals on racist views"; (2) "which conduct was, under the circumstances, prejudicial to good order and discipline and service discrediting."  Id. slip op. at 11.

The CCA held that the facts, taken in the light most favorable to the Government, showed that Appellant did make statements on the Internet that were anti-government and disloyal as well as statements that promoted extreme racial intolerance.  Id. slip op. at 7.  The CCA also held that those statements had a tendency to discredit the service or to be prejudicial to good order and discipline because "[y]oung, immature soldiers surfing the internet and discovering a U.S. Army paratrooper's profile advocating anti-government sentiments and extreme racist views could believe such disloyalty and racial intolerance is entirely acceptable conduct in our Army" and because "members of the general public have access to

6

[A]ppellant's publicly-posted comments, and upon reading them, may tend to find the Army -- as represented by [A]ppellant -- a disreputable institution, or one disserving [sic] less than full public esteem and respect." Id. slip op. at 8-9.

While Appellant was initially charged, inter alia, with multiple violations of Article 92, UCMJ, associated with recruiting servicemembers into extremist activity, distributing extremist literature, attending a Ku Klux Klan rally, and a violation of Article 134, UCMJ, for the Internet communications discussed above, at the end of consideration by the military judge at trial and the CCA, the only remaining charge related to extremist views was a remnant of the original Article 134, UCMJ, offense. Thus, the sole issue presently before the Court is whether the evidence is legally sufficient to support the second element of the attenuated version of the charged Article 134, UCMJ, offense remaining. We hold that it is not.

## B. Factual Background

Appellant first came to the attention of Army Criminal Investigative Division (CID) when a civilian police officer noticed an online profile containing racist views in which the author identified himself as a "US Army Paratrooper." The civilian officer notified CID at Fort Bragg. Army CID viewed two profiles assigned to Appellant's AOL e-mail address. The first, a general AOL profile, listed

Appellant's occupation as "Army/Paratrooper" and listed as a "personal quote" that "'[w]e must secure the existence of our people and a future for white children.' THE 14 WORDS – written by imprisoned matyr [sic] David Lane . . . ."

The second, a love.aol.com profile, stated, inter alia, that Appellant's occupation was an Army paratrooper, that he was single, seeking a "[f]emale for a casual or serious relationship" and was:

> a Pro-White activist doing what I can to promote the ideals of a healthier environement [sic]. I do not base my deeds on Hate [sic], but that of love for my folk's women & children. Political Affiliation is none -- This government is not worth supporting in any of its components. Natures [sic] and God's laws are eternal -- Love your own kind & fight for your own kind. There's no "HATE" in that!

A CID agent, Investigator Sturm, created an AOL instant messenger account and began conversing with Appellant via that service and eventually via e-mail. Sturm posed as a young female interested in the white supremacist movement. During their online conversations Appellant made racist statements and encouraged her to read various racist and anarchist websites and books. Sturm recorded her online conversations and e-mails with Appellant. She compiled a synopsis of those conversations which was admitted at trial along with the original transcripts of the conversations and e-mails.

At trial, Sturm testified in detail about her Internet communications with Appellant.  She testified about Appellant's views, and also testified that Appellant had posted on various websites catering to those with racist and anarchist views, identified himself as a member of the armed forces, and espoused similar views in message forums -- those posts were not admitted as evidence, based on the military judge sustaining the defense's hearsay objection.  Eventually, Appellant invited Sturm to a white supremacist rally and rock concert, which she did not attend.  Sturm did not testify that Appellant encouraged her to join a white supremacist group, overthrow the government, or take any specific action towards or against any person.

The Government's evidence concerning the Article 134, UCMJ, charge as it remains today consists of the testimony of Sturm, the evidence she gathered in the course of her online conversations, including Appellant's online profiles, and expert testimony that confirmed Appellant's statements in his online profiles, in particular the reference to the "14 Words," were consistent with the white supremacist movement.  No evidence was introduced as to either the actual or potential adverse impact of Appellant's online profile or statements on good order and discipline or to the actual or potential discredit to the armed forces.  In contrast, the defense introduced evidence from soldiers in Appellant's unit that he had good working

9

relationships with minorities in the unit and that there was no evidence that his racist views adversely affected his military performance or his unit.

At trial, the Government argued that Appellant was a racist, distributed racist material to his fellow soldiers, and attempted to recruit individuals into extremist activities. Specifically, Government counsel stated that the Article 134, UCMJ, offense was proven because "the accused, while holding himself out as a member of the United States Army . . . recruited others into activities involving racial intolerance" and because he violated Army Regulation 600-20, which prohibits participation in extremist organizations. In arguing before the military judge regarding the evidence to support the Article 134, UCMJ, offense, trial counsel focused solely on manifestations of the message expressed in the speech captured in the now-defunct Article 92, UCMJ, charges.

Appellant has long since been acquitted of distributing racist materials, attending racist rallies, and recruiting servicemembers into extremist activities. While Sturm's testimony and Appellant's online profiles show that Appellant held beliefs that are both disturbing and inconsistent with Department of Defense policies regarding racial equality and other matters, that alone is insufficient under the facts of this case to impose criminal sanctions under Article 134, UCMJ.

## II. Analysis

We review questions of legal sufficiency de novo as a matter of law. United States v. Young, 64 M.J. 404, 407 (C.A.A.F. 2007). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." United States v. Dobson, 63 M.J. 1, 21 (C.A.A.F. 2006) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). As reflected in our remand to the Court of Criminal Appeals, see supra at 5, this case involves legal sufficiency in the context of First Amendment considerations.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This protection permits the expression of ideas, even the expression of ideas the vast majority of society finds offensive or distasteful. See Virginia v. Black, 538 U.S. 343, 358 (2003) (citing Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)); R.A.V. v. St. Paul, 505 U.S. 377, 395-96 (1992); Texas v. Johnson, 491 U.S. 397, 414 (1989)). The sweep of this protection is less comprehensive in the military context, given the different character of the military community and mission. Parker v. Levy, 417 U.S. 733, 758 (1974); United States v. Priest, 45 C.M.R. 338, 344-46, 21 C.M.A. 564, 570-72

(1972); United States v. Gray, 20 C.M.A. 63, 66, 42 C.M.R. 255, 258 (1970).  But even under the potentially less protective First Amendment right afforded to servicemembers, and despite the offensive nature of Appellant's views and communications, we hold that the evidence is legally insufficient to support Appellant's conviction for the amended and remaining violation of Article 134, UCMJ.

A.   Free Speech and Article 134, UCMJ

Appellant's sole remaining conviction rests clearly on the offensive message of racial intolerance and dissatisfaction with the government expressed in his online profiles, communications with Sturm, and communications with others on Internet message boards, as relayed by Sturm.  The substantive messages conveyed therein, while distasteful, constitute Appellant's ideas on issues of social and political concern, which has been recognized as "the core of what the First Amendment is designed to protect."  Black, 538 U.S. at 365 (finding that the act of burning a cross may be a form of political speech); see also United States v. Brown, 45 M.J. 389, 398 (C.A.A.F. 1996) (recognizing that political speech "'occupies the core of the protection afforded by the First Amendment'" (quoting McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346 (1995))).

Parker v. Levy reiterated the point that differences between the military community and the civilian community result

12

in military law that "regulate[s] aspects of the conduct of members of the military which in the civilian sphere are left unregulated." 417 U.S. at 749. But the Supreme Court upheld Article 134, UCMJ, against constitutional attack for vagueness and overbreadth in light of the narrowing construction developed in military law through the precedents of this Court and limitations within the Manual for Courts-Martial (MCM) itself. Id. at 752-61. As such, a limited Article 134, UCMJ, does not make every "irregular or improper act" a court-martial offense and does not reach conduct that is only indirectly or remotely prejudicial to good order and discipline. MCM pt. IV, para. 60.c.(2)(a); see also William Winthrop, Military Law and Precedents 723-24 (2d ed. 1920 reprint) (commenting on Article 62 of the American Articles of War, the predecessor to Article 134, UCMJ, and stating that to be punishable, acts prejudicial to good order and discipline "must have been committed under such circumstances as to have directly offended against the government and discipline of the military state"). If it were otherwise, the forces of narrowing interpretation that saved Article 134, UCMJ, from constitutional challenge in Parker v. Levy would fail.

Our jurisprudence on charged violations of Article 134, UCMJ, involving speech thus recognizes the importance of the context of that speech. See United States v. Daniels, 19 C.M.A.

13

529, 534-35, 42 C.M.R. 131, 136-37 (1970) (holding that although a request for mast would generally be lawful, under the circumstances, the appellant's encouraging other servicemembers to request mast and refuse to fight in Vietnam was punishable under Article 134, UCMJ); see also infra at 20-22.

Consistent with the focus on context necessary to establish a violation of Article 134, UCMJ, while speech that would be impervious to criminal sanction in the civilian world may be proscribed in the military, this Court has long recognized that when assessing a criminal violation implicating the First Amendment:

> the proper balance must be struck between the essential needs of the armed services and the right to speak out as a free American.  Necessarily, we must be sensitive to protection of "the principle of free thought -- not free thought for those who agree with us but freedom for the thought that we hate."

Priest, 21 C.M.A. at 570, 45 C.M.R. at 344 (quoting United States v. Schwimmer, 279 U.S. 644, 654-55 (1929) (Holmes, J., dissenting)).

Prior to applying this balancing test to a charged violation of Article 134, UCMJ, involving speech, two threshold determinations must be made.  First, the speech involved must be examined to determine whether it is otherwise protected under the First Amendment.  Second, the Government must have proved the elements of an Article 134, UCMJ, offense.

1. Unprotected speech

No one disputes that servicemembers enjoy some measure of the right to free speech granted by the First Amendment. See Parker, 417 U.S. at 758; Brown, 45 M.J. at 395; Gray, 20 C.M.A. at 66, 42 C.M.R. at 258. However, the right to free speech is not absolute, and some speech -- e.g., dangerous speech, obscenity, or fighting words -- is not protected by the First Amendment, regardless of the military or civilian status of the speaker. Brown, 45 M.J. at 395 (citing Cohen v. California, 403 U.S. 15 (1971); Roth v. United States, 354 U.S. 476 (1957); Chaplinsky v. New Hampshire, 315 U.S. 568 (1942)).

The test for dangerous speech in the civilian community is whether "the words are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." Schenck v. United States, 249 U.S. 47, 52 (1919). Under the standard applicable to the civilian world, "clear and present danger" extends to speech "directed to inciting or producing imminent lawless action . . . likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447 (1969). A lower standard pertains in the military context, where dangerous speech is that speech that "interferes with or prevents the orderly accomplishment of the mission or presents a clear danger to

15

loyalty, discipline, mission, or morale of the troops." Brown,
45 M.J. at 395.[3]

   2.   Sufficiency of proof for a charged violation of
        Article 134, UCMJ, in the First Amendment context

   For any offense charged under Article 134, UCMJ, clauses 1
or 2, the government must prove:  (1) that the accused did a
certain act, and (2) that the act was, under the circumstances,
to the prejudice of good order and discipline or was of a nature
to bring discredit upon the armed forces.  MCM pt. IV, para.
60.b.  To satisfy the due process requirements of the Fifth

---

[3] In addition, the Supreme Court and this Court have made it
clear that additional burdens may be placed on First Amendment
rights in the context of the military, given the different
character of the military community and mission.  Parker, 417
U.S. at 758; Priest, 21 C.M.A. at 570-72, 45 C.M.A. at 344-46;
Gray, 20 C.M.A. 63, 42 C.M.R. 255.  Thus, no one questions that
deference must be given to military authorities' determination
that military needs justify particular restrictions on the First
Amendment, and that military commanders may enact regulations
and take administrative actions that place burdens on, or exact
administrative consequences for, speech, expression, and the
exercise of religion that would not pass constitutional muster
in the civilian context.  See, e.g., Goldman v. Weinberger, 475
U.S. 503, 510 (1986) (holding that a letter of reprimand issued
for failure to obey a lawful order forbidding the wearing of a
yarmulke while in uniform did not violate the First Amendment
based on deference to military authorities' determination of
military need for uniformity); Brown v. Glines, 444 U.S. 348,
354-58 (1980) (holding that an Air Force regulation prohibiting
distribution of petitions on base without permission did not
violate the First Amendment).  The instant case involves
criminal liability rather than administrative action, however,
and the Government has not argued that any regulation prohibits
the particular speech at issue in the single specification under
Article 134, UCMJ, before us.  Rather, Appellant was found not
guilty of violating the very regulation enacted to prohibit
extremist activity.

Amendment, the Government must prove beyond a reasonable doubt every element of the charged offense. In re Winship, 397 U.S. 358, 364 (1970); Jackson v. Virginia, 443 U.S. at 321. In the context of the First Amendment, in order to meet the second element for conduct charged under a "prejudice of good order and discipline" theory, we have required that the prosecution show a "'reasonably direct and palpable'" connection between an appellant's statements and the military mission. See Priest, 21 C.M.A. at 569, 45 C.M.R. at 343 (citation omitted); see also Brown, 45 M.J. at 396 ("'[O]ur national reluctance to inhibit free expression dictates that the connection between statements or publications involved and their effect on military discipline be closely examined'." (quoting Priest, 21 C.M.A. at 569-70, 45 C.M.R. at 343-44)). This Court has not directly addressed the connection needed between an appellant's statements and the military mission in the context of speech alleged to be "service discrediting." We note that the Government has cited no case in which this Court has upheld a conviction in a contested case based upon a violation of Article 134, UCMJ, for service discrediting speech solely because the speech would be offensive to many or most. We conclude that a direct and palpable connection between speech and the military mission or military environment is also required for an Article 134, UCMJ, offense charged under a service discrediting theory. If such a

17

connection were not required, the entire universe of servicemember opinions, ideas, and speech would be held to the subjective standard of what some member of the public, or even many members of the public, would find offensive.  And to use this standard to impose criminal sanctions under Article 134, UCMJ, would surely be both vague and overbroad.  Cf. United States v. O'Connor, 58 M.J. 450, 455 (C.A.A.F. 2003) ("[T]he connection between any conduct protected by the First Amendment and its effect in the military environment [must] be closely examined.  The absence of . . . record development concerning the service-discrediting character of [the] conduct precludes us from engaging in that 'close examination' in the present case.") (citation omitted).

　　3.  Balancing test may be mooted

　　If the speech is otherwise protected by the First Amendment, and if a reasonably direct and palpable connection between the speech and the military mission or military environment is established, only then need we determine whether criminalization of that speech is justified despite First Amendment concerns.  Ultimately, this Court must weigh the gravity of the effect of the speech, discounted by the improbability of its effectiveness on the audience the speaker sought to reach, to determine whether the conviction is warranted.  Priest, 21 C.M.A. at 570-71; 45 C.M.R. at 344-45.

18

Where, as here, the record did not establish a reasonably direct and palpable connection between the speech and the military at all, let alone the military mission or military environment, the balancing test is mooted by the legal insufficiency of the charged offense.

### B. Appellant's Speech

#### 1. Appellant's speech as protected speech

Appellant's various communications on the Internet -- which, while repugnant, are not criminal in the civilian world, see Brandenburg, 395 U.S. at 447 (holding that even advocacy of racist violent speech is protected speech if it is not likely to incite or produce such violence) -- did not constitute unprotected "dangerous speech" under the circumstances of this case. No evidence was admitted that showed the communications either "interfere[d] with or prevent[ed] the orderly accomplishment of the mission," or "present[ed] a clear danger to loyalty, discipline, mission, or morale of the troops." Brown, 45 M.J. at 395 (citations omitted).

Further, while one might colloquially describe the ideas expressed by Appellant as obscene,[4] they are not legally obscene

---

[4] See Miller v. California, 413 U.S. 15, 18 n.2 (1973) (noting that the dictionary definition of "obscene" includes those things which are "'grossly repugnant to the generally accepted notions of what is appropriate'" or "'offensive or revolting as countering or violating some ideal or principle'") (citation omitted).

19

as defined by First Amendment jurisprudence. See Miller, 413 U.S. at 24-25 (requiring that the material contain a depiction or description of sexual conduct in a patently offensive way to be considered obscenity). Neither can they be classified as unprotected "fighting words." See Chaplinsky, 315 U.S. at 572 (defining "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace").

Consequently, we conclude that Appellant's speech is protected speech under the First Amendment and must now turn to an analysis of whether the Government has shown a reasonably direct and palpable connection between the speech and the military mission or military environment.

2.  No evidence of a connection between Appellant's speech and the military mission

We address the speech at issue in this case in light of the specification alleging Appellant's offense as modified by the CCA. After modification, the specification alleges that Appellant:

> wrongfully advocated anti-government and disloyal sentiments, while identifying himself as a "US Army Paratrooper" on an American OnLine Profile and advocat[ed] racial intolerance by counseling and advising individuals on racists views and that under the circumstances, the [Appellant's] conduct was to the prejudice of good order and discipline in the

> armed forces or was of a nature to bring discredit upon the armed forces.[5]

We must consider the e-mails and instant messages, the forum posts, and the AOL profile statements to determine whether any or all of them was shown to have a reasonably direct and palpable effect on the military mission or military environment. Looking to our prior cases involving speech and Article 134, UCMJ, neither the form, forum, nor substance of Appellant's speech is clearly analogous to the speech at issue in prior cases examining exigencies of the military service and mission that permitted limitations on the protections of the First Amendment. See, e.g., Parker, 417 U.S. at 736-37; Priest, 21 C.M.A. at 568, 45 C.M.R. at 342; Gray, 20 C.M.A. at 63, 42 C.M.R. at 255.

---

[5] We note that the prosecution elected not to charge Appellant with the specifically detailed offense of "Disloyal Statements" as articulated in the MCM pt. IV, para. 72. The disloyal statements offense specifically requires the government to prove "[t]hat the statement was made with the intent to promote disloyalty or disaffection toward the United States by any member of the armed forces or to interfere with or impair the loyalty to the United States or good order and discipline of any member of the armed forces . . . ." MCM pt. IV, para. 72.b.(4). As the President has specifically stated elements of an Article 134, UCMJ, offense relating to disloyal statements, we cannot consider "disloyal statements" as a general Article 134, UCMJ, offense without the Government pleading and proving those elements. Cf. United States v. Harvey, 19 C.M.A. 539, 541, 42 C.M.R. 141, 143 (1970) (noting that "[t]he preemption doctrine prohibits the armed services from eliminating one or more vital elements of a particular offense in order to charge the remaining elements as conduct to the prejudice of good order and discipline").

The leading cases involving the intersection of Article 134, UCMJ, and the First Amendment have involved facts adduced at trial that showed that the appellant at least attempted to direct his speech to servicemembers. See, e.g., Parker, 417 U.S. at 761 (finding a violation of Article 134, UCMJ, when servicemember "publicly urge[d] enlisted personnel to refuse to obey orders"); Brown, 45 M.J. at 398 (holding that organizing a unit-wide meeting to advocate desertion violated Article 134, UCMJ); Priest, 21 C.M.A. at 572, 45 C.M.R. at 346 (finding direct and palpable connection to good order and discipline when the appellant distributed an extremist newspaper at the Pentagon and Navy exchange); Daniels, 19 C.M.A. at 533-35, 42 C.M.R. at 135-37 (concluding that there was a direct connection to good order and discipline when the appellant assembled all African-American members of his unit and attempted to convince them to not fight in "the white man's war"). Because in those cases the speech was directed to servicemembers, the effect of the speech on the military mission was both palpable and obvious.

We are faced with a very different set of facts in this case. There is no evidence that any of Appellant's statements were directed at military members or ever reached his unit. And it is pure speculation that the racist views propounded on the Internet by a single person purporting to be a paratrooper either were viewed or would be viewed by other servicemembers or

22

would be perceived by the public or a servicemember as an expression of Army or military policy.

We need not tarry long over the private statements made by Appellant through e-mails and instant messages to a person whom he believed to be a like-minded civilian friend.  The Government cites no authority supporting criminal penalties for unpopular and distasteful views made in private between two individuals that fall short of proposing criminal activity.[6]  See, e.g., United States v. Williams, 128 S. Ct. 1830, 1842 (2008) (drawing distinction between advocating child pornography and proposals to provide or obtain child pornography).

Moreover, while statements made on an online message board catering to those with anarchistic and racist views may theoretically be more likely to have a direct and palpable effect on the military mission or environment, no evidence of this likelihood or effect was produced at trial, and copies of the postings themselves were excluded based on a hearsay objection that the military judge sustained.

Finally, and for many of the same reasons, there is no evidence that Appellant's statements in his AOL profiles had a reasonably direct and palpable effect on the military mission or

---

[6] Members of the public are not generally able to view e-mails and instant messenger conversations between individuals, and there is no evidence in the record to suggest that the e-mails and conversations between Appellant and Sturm either were or could be accessed by the public.

military environment.  First, no evidence was produced that the profiles were directed at other members of the military, or that any military member other than the investigators stumbled upon them or was likely to do so.  Moreover, one of the profiles was posted in connection with a "love.aol.com" account.  Nothing in the record supports the conclusion that the purpose or likely outcome of including the racist statements was anything other than to attract women whose beliefs were similar to Appellant's own.  Nor did the Government provide any evidence that either servicemembers or members of the general public would even understand the source or larger import of the quoted "14 Words" or other language.  The experts who testified spoke only to the meaning of the phrases themselves, not to how such statements might be received.

The lower court supported the legal sufficiency of the Article 134, UCMJ, offense by postulating that Appellant's speech was:  (1) service discrediting because "members of the general public have access to appellant's publicly-posted comments, and upon reading them, may tend to find the Army -- as represented by [A]ppellant -- a disreputable institution, or one disserving less than full public esteem and respect"; and (2) undermined good order and discipline because "[y]oung, immature soldiers surfing the internet and discovering a U.S. Army paratrooper's profile advocating anti-government sentiments and

24

extreme racist views could believe such disloyalty and racial intolerance is entirely acceptable conduct in our Army." Wilcox IV, No. Army 20000876, slip op. at 8-9.

It is telling, given the explicit instructions by this Court and the factfinding power of the CCA, that based on the record of trial this is the best rationale supporting the legal sufficiency of the remaining Article 134, UCMJ, offense available. Of course a rationale supplied by the CCA is not itself evidence. The mere possibility, assumed by the CCA and unsupported by the record, that a servicemember or member of the public might stumble upon Appellant's expression of his beliefs, believe he was in the military, and attribute his views to the military is so tenuous and speculative as to be legally insufficient to support the second element of the charged violation of Article 134, UCMJ.

3. No balancing required

Having concluded that there is no evidence establishing that Appellant's speech was either prejudicial to good order and discipline or service discrediting, we are unable to conduct the ultimate balancing of First Amendment considerations and military needs that Priest requires. See O'Connor, 58 M.J. at 455 (similarly declining to examine balance in the absence of record development). Rather, we conclude that there can be no

conviction under Article 134, UCMJ, for Appellant's otherwise protected speech.

### III.  Decision

It is worth restating that the issue in this case is whether Appellant's statements constituted a criminal offense in light of the evidence set forth in the record of this case, not whether this Court approves of the statements made by the Appellant.  We do not.  But condemnation and conviction are drastically different when the First Amendment is involved, and our disagreement with his statements cannot substitute for the Government's failure to introduce evidence legally sufficient to meet the element of either service discrediting behavior or prejudice to good order and discipline necessary for a conviction under Article 134, UCMJ.  While a different record might support a conviction for the offense as charged, because no evidence established the second element of the Article 134, UCMJ, offense in this case, it is clear that no reasonable factfinder could have found the essential elements of the charged offense beyond a reasonable doubt.[7]

The decision of the United States Army Court of Criminal Appeals as to Charge V and its Specification and the sentence is

---

[7] For example, if the Government had introduced evidence focused on the service discrediting nature of the conduct, such as the extra-record material described by the dissent, see __ M.J. __ (21-25) (Baker, J., dissenting), this would be a very different case.

reversed.  The findings as to Charge V and its Specification are set aside and that charge and specification are dismissed.  The decision is affirmed as to the remaining charges.  The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals for sentence reassessment on the affirmed charges.

BAKER, Judge (dissenting):

I respectfully dissent for two reasons.

First, I do not agree with the majority's conclusion that no rational trier of fact could find that under the circumstances, the posting of Appellant's AOL profile was "of a nature to bring discredit upon the armed forces." Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). Indeed, the majority concludes that there is "[n]o evidence . . . introduced as to either the actual or potential adverse impact of Appellant's online profile or statements on good order and discipline or to the actual or potential discredit to the armed forces." United States v. Wilcox, __ M.J. __ (9) (C.A.A.F. 2008). To the contrary, a publicly available Internet profile that: (1) indicates that the profile is posted by an "Army Paratrooper" at Fort Bragg; (2) gives the paratrooper's name as "Wskullhead"; and (3) indicates his race as "Aryan" and that he is a pro-white activist (among other things) is of a nature to bring discredit upon the Army. More to the point, from a legal sufficiency standpoint the Government is not required to offer direct proof of discredit; a rational trier of fact is allowed to reasonably draw such an inference from proof of the circumstances surrounding the conduct at issue.

Second, having concluded that "the sole issue presently before the Court is whether the evidence is legally sufficient

to support the second element of the attenuated version of the charged Article 134, UCMJ, offense," id. at __ (7), the majority nonetheless considers constitutional questions that might otherwise be raised if the evidence were legally sufficient. Generally, courts should avoid constitutional questions where cases are properly resolved on other grounds. Crowell v. Benson, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and . . . a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."); accord, e.g., Haynes v. United States, 390 U.S. 85, 92 (1968) (dictum); Schneider v. Smith, 390 U.S. 17, 27 (1968); United States v. Rumely, 345 U.S. 41, 45 (1953); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring).

As a result, it is not clear what relationship, if any, this constitutional discussion has to the Court's conclusion regarding legal sufficiency. In my view, one does not reach the constitutional questions in this case unless one first concludes that the evidence would otherwise be legally sufficient, at which point the question becomes whether the conduct is constitutionally protected as free speech. For the reasons stated below, Appellant's profiles fell outside the zone of free

speech protection; the Government had a compelling interest in regulating Appellant's speech and did so using narrowly tailored means.

## SUFFICIENCY OF THE EVIDENCE

This case is not a model of clarity, or much else. But the question remains: Was there legally sufficient evidence presented to the military judge such that "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact" could have found beyond a reasonable doubt that Appellant's posting of his AOL profile was of a service discrediting nature? Jackson v. Virginia, 443 U.S. 307, 319 (1979). In my view, the evidence is sufficient.

First, Appellant's two AOL profiles were entered into evidence and were before the military judge as trier of fact. So were Appellant's e-mail exchanges with Investigator Sturm, also known as, "Country Bumpkin," an undercover Army CID agent playing the role of a fellow traveler on the road of racial extremism.

Second, the statements were intended for a wider audience, and therefore demonstrated a tendency to discredit. The record -- or reasonable inferences drawn from the record -- indicates that Appellant's AOL profiles were posted on the Internet and were (at least) available to AOL subscribers. As to who had access to such profiles, Investigator Sturm testified, "It can

be anyone that has an AOL account or is online." In any event, the profiles were available to members of the public.

Third, there is sufficient evidence that this conduct reflected disrepute on the armed forces. The profiles identified Appellant as an "Army Paratrooper" and "Army/Paratrooper" respectively. For "location," Appellant entered, "Fort Bragg." One profile includes a thumbnail picture of Appellant with close-cropped hair.

Fourth, the profiles included the following statements, and included a hyperlink to a website associated with the white supremacy extremist and convicted murderer David Lane:[1]

I'd also like to say . . .

I am a Pro-White activist doing what I can to promote the ideals of a healthier environement [sic]. I do not base my deeds on Hate, but that of love for my folk's women & children. Political Affiliation is none -- This government is not worth supporting in any of its components. Natures [sic] and God's laws are eternal -- Love your own kind & fight for your own kind. There's no "HATE" in that!

Personal Quote: "We must secure the existence of our people, and a future for white children" THE 14 WORDS -- written by imprisoned matyr [sic] David Lane www.14words.com.

---

[1] Lane, a founder of the white supremacist organization, The Order, died in prison while serving a life sentence for, among other things, the 1984 murder of radio talk show host Alan Berg. Anti-Defamation League, David Lane, White Supremacist Terrorist Ideologue, Dies in Prison, http://www.adl.org/main_Extremism /david_lane_dies.htm.

4

In response to this evidence, the majority makes four arguments in concluding that the evidence was legally insufficient to prove a tendency to discredit.

First, the majority argues that "the racist views propounded on the Internet by a single person purporting to be a paratrooper" would not be viewed as an expression of Army policy. There are three problems with this argument. First, Appellant did not "purport" to be an Army paratrooper; he was an Army paratrooper. Second, service discredit is not hinged to service policy. To the contrary, service discredit is likely to occur precisely because the conduct in question does not reflect service policy or values. This Court, for example, has consistently upheld convictions under the second clause of Article 134, UCMJ,[2] for viewing child pornography; we have done so because servicemembers discredit the armed forces when they view pornography, not because the public or the courts might believe the viewing of child pornography is military policy. Third, even when conduct is contrary to express military policy, a failure to punish such conduct may nonetheless suggest or reflect to the public military tolerance for the conduct in question.

Second, the majority argues that "no evidence was produced that the profiles were directed at other members of the

---

[2] Hereinafter referred to as Article 134(2), UCMJ.

5

military."  Wilcox, __ M.J. at __ (24).  This might be relevant if Appellant had been charged alone with conduct of a nature to prejudice good order and discipline, but he was charged in the alternative with conduct that had a tendency to discredit the armed forces.  It has long been the case in military law that the discrediting nature of conduct alleged under Article 134(2), UCMJ, is assessed from the perspective of the public.  United States v. Thompson, 3 C.M.A. 620, 623, 14 C.M.R. 38, 41 (1954).

Here, I agree with the majority's facts, but not its conclusion.  The legal analysis correctly focuses on the profiles, because the Government did not offer evidence that Appellant sought to proselytize racism within his unit, or otherwise take steps that would constitute threats to good order or discipline.  Indeed, as the majority points out, the defense presented evidence to the contrary.  In United States v. Gray, 20 C.M.A. 63, 68, 42 C.M.R. 255, 260 (1970), the Court concluded "the evidence must establish 'reasonably direct and palpable' prejudice to good order and discipline," but the first half of this conclusion gives the reason:  "Since the statement was published on a military reservation and only military persons were involved."  The inverse is true here.  The evidence -- the profiles -- indicates that Appellant's efforts were directed outward to the public on the Internet.

Third, the majority argues that "no evidence was produced that . . . any military member other than the investigators stumbled upon them or was likely to do so." Wilcox, __ M.J. at __ (24). As noted above, with respect to the issue of discredit, the relevant audience is not the military, but the public at large. Here, the investigator testified that the profiles were available to AOL account holders. Moreover, the critical test is not whether Appellant caused discredit, but whether his conduct had a tendency to do so. United States v. Saunders, 59 M.J. 1, 11 (C.A.A.F. 2003) ("The test of service discredit is whether Appellant's acts had a 'tendency to bring the service into disrepute[.]'") (citation omitted). Thus, while it is hard to argue that something could have a tendency to cause discredit if it is impossible for others to become aware of the conduct, it is not a requirement that the Government prove actual awareness on the part of the public.

Fourth, the majority argues, "[n]or did the Government provide any evidence that either servicemembers or members of the general public would even understand the source of the quoted '14 Words' or other language." Wilcox, __ M.J. at __ (24). I think the words speak for themselves: "We must secure the existence of our people, and a future for white children"; "I am a Pro-White activist"; and "W/boy seeks White female."

7

Putting aside the plain meaning of the words, the majority's position ignores the rationale for the standard set forth in Jackson which "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." 443 U.S. at 319. The question presented is whether a rational trier of fact might reasonably infer or conclude that the words were racist, extremist, and service discrediting.

Any rational trier of fact as well as the general public would understand that these are racist words.[3] But if there was any confusion regarding the racist nature of these words, Appellant's profile entry for "ethnicity" might help out: "White (propper [sic] historical name is 'Aryan')." This same trier of fact might then reasonably infer that these racist words uttered in the form of a personal quote from an "Army Paratrooper" might have a tendency to discredit the Army.

Finally, in United States v. Guerrero, 33 M.J. 295 (C.M.A. 1991), a cross-dressing case, this Court concluded "it is not

---

[3] As an aside, I also believe that most military judges would have a common understanding, after the Alfred P. Murrah Federal Building bombing —- commonly referred to as the Oklahoma City Bombing -- and the spate of domestic terrorism by white supremacists in the 1990s, of who David Lane was and what he and his "14 Words" stood for. But that is not the basis on which I would find legal sufficiency. In my view, any rational trier of fact would understand these profiles as racist. The words speak for themselves.

the [conduct] <u>per se</u> which gives rise to the offense.  Rather, it is (1) the time, (2) the place, (3) the circumstances, and (4) the purpose for the [conduct], all together, which form the basis for determining if the conduct is 'to the prejudice of good order and discipline . . . or was of a nature to bring discredit upon the armed forces.'"  <u>Id.</u> at 298 (citation omitted).  Therefore, the "circumstances" of the posting of Appellant's AOL profile, including the e-mail conversations between Appellant and Investigator Sturm are relevant on the question of legal sufficiency.

One of Appellant's purposes for posting the profile was to attract like-minded individuals to whom he could espouse his white supremacist views and to whom he could deliver propaganda devoted to these views.  He sought to facilitate this endeavor by holding himself out as a member of the armed forces, an "Army Paratrooper."  The investigator's testimony is rife with Appellant's expression of his views, and some illustrations follow:

> Q:  Did [the accused] mention anything about racial views?
>
> A:  . . . He says, [reading from an e-mail] "Be cautious, they're openly [atheist], but WAR's [White Aryan Resistance] racial views are solid . . . .
>
> . . . .
>
> Q:  . . .  What, if anything, did you find out about the possible identity of Wskullhead . . . ?

9

> A:   He identifies himself as PFC Wilcox and gives me his unit and his address.
>
> . . . .
>
> Q:   Okay; and, what books does he recommend to you?
>
> A:   The AST Bible.
>
> Q:   What is that?
>
> A:   . . . "It is a Jew free bible translated from the Greek that Christ spoke (sic).  It shows the bible was a pro-white religious writing and for God's true covenant people."

During a later colloquy between the trial counsel and the investigator, the witness describes how Appellant recommended she read a book entitled Vigilante[]s of Christendom:

> Q:   Does he . . . talk about the action that the people took that are depicted in the book?
>
> A:   . . . Yes.  He states that they went out -- "They didn't ask for government permission or their neighbors' approval, they just did it. . . .
>
> Q:   And he was referring to a killing of a race-mixed couple?
>
> A:   Yes, Ma'am.

While Appellant no longer faces charges related to these e-mail discussions, the testimony remains part of the record for sufficiency purposes and is relevant on the issue of the discrediting nature of the profile.

In summary, the military judge had before him abundant evidence to find specific conduct under circumstances having a tendency to discredit the armed forces or from which he could

reasonably infer that such conduct had a tendency to discredit the armed forces. [4]

### THE CONSTITUTIONAL QUESTION

Having concluded that the evidence is legally sufficient, the question becomes whether Appellant's words might otherwise fall within a zone of protection as a constitutional exercise in free speech. This is a closer question than that presented on legal sufficiency.

At the start, it is critical to focus on the speech in question, as opposed to the figurative slippery slope. The question is:

> Does the right to free speech enshrined in the First Amendment extend to a soldier who makes racist, service discrediting statements in a public manner while holding himself out as a member of the armed forces?

The question is not:

> Does a soldier have a constitutional right to make racist, unpopular, or distasteful statements in private to his comrades, or when not in uniform or otherwise holding himself out as a member of the armed forces?

This is a complicated question, in part because it is a novel question. "[T]he 'search for the outer limits [of the

---

[4] The majority asserts that the dissent's discredit analysis is based on extra-record material and concludes that "this would be a very different case" were this material part of the record. However, the material that demonstrates discredit is part of the record. The profiles were admitted into evidence and are part of the record, as is testimony regarding their public availability, as well, of course, as any reasonable inferences drawn from both sets of evidentiary facts.

11

First Amendment right]' has, in the main, been restricted to the civilian and not to the military community and, even then, as we have said, the right is not to be exercised totally unrestricted." United States v. Howe, 17 C.M.A. 165, 177, 37 C.M.R. 429, 441 (1967) (citation omitted), abrogated on other grounds by United States v. Frelix-Vann, 55 M.J. 329, 332 (C.A.A.F. 2001).

This Court has not had occasion to address a First Amendment challenge to the application of an Article 134(2), UCMJ, specification. The Court has addressed conduct unbecoming an officer and a gentleman under Article 133, UCMJ, 10 U.S.C. § 933, where a commissioned officer joined a public protest of the Vietnam conflict in civilian attire, carried a placard calling the President a fascist, and was recognized as an officer. See Howe, 17 C.M.A. at 167-70, 37 C.M.R. at 431-34.

The Court has also addressed Article 134, UCMJ, in the First Amendment context in "good order and discipline" cases; however, these cases are distinct from those involving service discrediting conduct in at least two ways. First, as a factual matter, the governmental interests at stake are necessarily more granular. That is to say, speech tending to prejudice good order and discipline is more easily identified because it will generally come in the form of words tending to incite riot or mutiny. Second, and more importantly, as a matter of law,

12

speech charged as an offense prejudicial to good order and discipline under Article 134(1), UCMJ, leads logically, if not inexorably, toward the application of the clear and present danger-incitement test.  For our Court, this test is drawn from United States v. Priest, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972), which, of course, is drawn from the civilian test for incitement in Brandenburg v. Ohio, 395 U.S. 444 (1969).  In both cases the critical question concerns the proximity of a potential immediate and concrete harm:

> The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.  It is a question of proximity and degree.

Priest, 21 C.M.A. at 570, 45 C.M.R. at 345 (citing Schenk v. United States, 249 U.S. 47, 52 (1919)).

Further, the case law is susceptible to multiple interpretations and applications.  In United States v. Brown, 45 M.J. 389, 396 (C.A.A.F. 1996) (citation omitted), a legitimate interest standard was applied, "Courts will 'not overturn a conviction unless it is clearly apparent that, in the face of a First Amendment claim, the military lacks a legitimate interest in proscribing the defendant's conduct.'"  However, in my view, the Brown legitimate interest test does not adequately protect the liberty interests involved, for virtually anything might be viewed as a "legitimate interest" when national security is

13

invoked.  Howe is more analogous to the present case because it involved speech without apparent incitement.  However, the Court in the end treated the case under the good order and discipline rubric, focusing on the more immediate of the two charges, that of contemptuous conduct under Article 88, UCMJ, 10 U.S.C. § 880 (2000).  The Court concluded that the evil Congress sought to avoid is "the impairment of discipline and the promotion of insubordination by an officer of the military service in using contemptuous words toward the [Commander-in-Chief]."  Howe, 17 C.M.A. at 173, 37 C.M.R. at 437.  "That Article 133 affronts no constitutional concept has seemingly never been in doubt. . . . The right to free expression is not here curtailed. . . . In truth, Article 133 concerns only the abuse of that right."  Id. at 176, 37 C.M.R. at 440 (citation omitted).

In short, this Court's case law does not answer the question as to what constitutional test applies to service discrediting speech prosecuted under Article 134(2), UCMJ.  What test should apply?

There are at least five buoys that might help to mark the constitutional channel through the otherwise perilous shoal that skirts the boundary between free speech and national security.

First, there is the text of the amendment itself. "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Free speech is a hallmark of

democracy, especially and in particular where that speech is distasteful.  A society that tolerates such speech is a strong society.  It is a society that recognizes that the answer to a bad idea is a better idea.[5]  In a democracy, a better idea is communicated through the exercise of free speech.  That is but one reason why we cannot have democracy without free speech.  Moreover, citizens cannot effectively safeguard their liberty and their security if they are not free to test, challenge, and question their government.

Second, the exercise of speech is free, but it is not unlimited.  The Supreme Court in Brandenburg makes this clear, distinguishing between protected speech and speech that might nonetheless create an imminent condition of panic, alarm, or violence:

> [T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

Brandenburg, 395 U.S. at 447 (citing Dennis v. United States, 341 U.S. 494 (1951); Yates v. United States, 354 U.S. 298,

---

[5] Alfred Whitney Griswold, historian and president of Yale University, 1950-1963, in Essays on Education (1954), and quoted in N.Y. Times, Feb. 25, 1959, said "Books won't stay banned. They won't burn.  Ideas won't go to jail.  In the long run of history, the censor and the inquisitor have always lost.  The only sure weapon against bad ideas is better ideas.  The source of better ideas is wisdom.  The surest path to wisdom is a liberal education."

320-24 (1957)).

Similarly, for example, one is not free to threaten the President in speech or conduct. United States v. Ogren, 54 M.J. 481, 482 (C.A.A.F. 2001). In the military, as well, a servicemember may be prosecuted for using contemptuous words against the Commander-in-Chief, whether or not those words would be considered "free speech" in civilian society. Article 88, UCMJ; Article 133, UCMJ; Howe, 17 C.M.A. at 178, 37 C.M.R. at 442.

Third, the Supreme Court distinguishes between the content of speech and the time, place, and manner of speech; the Court is more permissive with respect to limitations on the time, place, and manner of speech. See generally Cox v. Louisiana, 379 U.S. 536 (1965); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983). It affords more protection to the content of speech, even if the content restriction applies only within a particular time, place, or manner. See Boos v. Barry, 485 U.S. 312, 319-20 (1988).

More generally, and here is the critical point, as this distinction illustrates, the Court applies different First Amendment tests in different contexts. It is not a one-shoe fits-all approach. In Goldman v. Weinberger, 475 U.S. 503, 509 (1986), superseded by statute on other grounds, Religious

16

Apparel Amendment, Pub. L. No. 100-180, § 508 (a)(2), 101 Stat. 1086 (1987), as recognized in Cutter v. Wilkinson, 544 U.S. 709, 722, (2005), for example, the appellant -- an Air Force officer -- argued that a regulation restricting his First Amendment right to wear a yarmulke in uniform was unconstitutional "unless the accoutrements create a 'clear danger' of undermining discipline and esprit de corps." However, the Court declined to apply the clear danger test, stating instead, "we hold that those portions of the regulations challenged here reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity." Id. at 510. In Boos, a case involving restrictions on the right to protest outside embassies, the Court applied a strict scrutiny-compelling interest analysis. 485 U.S. at 321.[6]

In the context of this Court, it happens that one shoe has generally fit all, because our Article 134, UCMJ, cases have all

---

[6] Also, it is interesting to note that the Supreme Court has applied varied tests in the context of First Amendment challenges to regulations intended to preserve order through the regulation of speech. See, e.g., Cutter, 544 U.S. at 723 n.11 (discussing standard contained in the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to penal context, "Courts . . . may be expected to recognize the government's countervailing compelling interest in not facilitating inflammatory racist activity that could imperil prison security and order"); Turner v. Safley, 482 U.S. 78, 89 (1987), superseded by statute on other grounds, Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, § 2, 107 Stat. 1488, as recognized in Jolly v. Coughlin, 76 F.3d 468 (2d Cir. 1996) (applying rational basis test).

been disorder cases, involving the risk if not the reality of incitement to disorder or threats to military discipline.  Thus, we have not been compelled to explore the potential application of other tests in different factual contexts.

Fourth, the Constitution applies to members of the armed forces except in cases where the express terms of the Constitution make such application inapposite.  United States v. Marcum, 60 M.J. 198, 205 (C.A.A.F. 2004).  It is axiomatic that those who do so much to defend the Constitution as citizen-soldiers should also receive its benefits.  Indeed, it is for the courts to ensure that this principle is not just a truism or slogan, but a meaningful reality.  Moreover, the exercise of free speech can directly benefit good order and discipline, providing an important outlet for soldiers to vent and blow steam while operating in difficult circumstances.

Fifth, the Constitution and its safeguards -- in particular those contained in the Bill of Rights -- may apply differently in the military context.  This is evident in the case of the Fourth Amendment, where determinations as to what is reasonable may well differ between the civilian home and the military barracks.  It is also evident with respect to the First Amendment, where the Supreme Court has expressly stated:

> While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military

> mission requires a different application of those protections.  The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

Parker v. Levy, 417 U.S. 733, 758 (1974).  As stated in Priest, the question becomes one of balance, "[T]he proper balance must be struck between the essential needs of the armed services and the right to speak out as a free American."  21 C.M.A. at 570, 45 C.M.R. at 344.  Or, as stated by Chief Judge Learned Hand, "'In each case (courts) must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.'"  Id. (quoting Dennis v. United States, 341 U.S. 494, 510 (1951)).

Based on the foregoing, I reach the following legal conclusions.  First, as the Supreme Court has made clear, different tests may pertain in different factual contexts.  This seems especially apparent in the military context.  The clear and present danger-incitement test is unworkable in the context of a service discrediting case involving speech.  The test does not fit the context presented, neither in terms of describing the governmental and national interests that may be at stake, nor the interest of the servicemembers involved.  In addition, the breathless urgency of "clear and present danger" does not fit as a threshold for the more indirect consequences of service discrediting conduct.  Whereas threats to good order and

19

discipline can be measured in proximity and scope, if the test is applied in good faith, it is not clear how matters of discredit alone might ever pass constitutional muster. Indeed, to the extent this Court regards the incitement test as the appropriate test for all Article 134, UCMJ, speech cases, it would seem that it is effectively determining that Article 134(2), UCMJ, is generally unconstitutional if applied to exercises in speech.

Second, the most analogous civilian test to the service discrediting context is that pertaining to content-based restrictions -- here the content restriction is on service discrediting speech. In the civilian context, content-based restrictions on speech are subject to exacting review in the form of the strict scrutiny test. Boos, 485 U.S. at 321. Strict scrutiny requires the state to show that the "'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" Id. at 321-22 (citing Perry Educ. Ass'n, 460 U.S. at 45; Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, 482 U.S. 569, 572-73 (1987); Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 800 (1985); United States v. Grace, 461 U.S. 171, 177 (1983)).

Third, as in other contexts, the test must be applied in the military context, balancing "between the essential needs of

the armed services and the right to speak out as a free American." Priest, 21 C.M.A. at 570, 45 C.M.R. at 344. Here, the distinction between service discrediting conduct and incitement to disorder may make a difference in outcome, not by application of the clear and present danger test, but because the discredit caused may be so diffuse or tangential to the government's interests as to be outweighed by a servicemember's interest in speech.

As Applied in This Case

Applying strict scrutiny analysis to the case at hand, two questions arise. First, what are the Government's compelling interests in regulating Appellant's speech through criminal sanction? Second, is the restriction narrowly tailored to achieve those compelling interests?

A. The Compelling Interests

There are at least three national interests that are at stake in the present case.

First, the Government has a compelling interest in preventing the advent and spread of hate groups within the armed forces. It is well established that the Internet is used as a recruiting mechanism for extremist groups, including racist groups.[7] As a result, it would seem beyond doubt that the

---

[7] See, e.g., Staff of the S. Comm. on Homeland Security and Governmental Affairs, 110th Cong., Violent Islamist Extremism,

21

Government would have a compelling interest in ensuring that the Army is not a breeding ground for extremist recruitment and potential breeding ground for acts of extremist violence.[8]  The Government has a parallel interest in ensuring the Internet is not used by members of the armed forces to self-select for such recruitment or to foster such recruitment.  Of course, that is exactly what Appellant was seeking to do in his communications with Investigator Sturm.

Second, the Government has a compelling interest in fostering the perception (and the fact) that the military is race-neutral, politics-neutral,[9] and disciplined.  One difference

---

the Internet, and the Homegrown Terrorist Threat (Comm. Print 2008); Stephan Talty, The Method of a Neo-Nazi Mogul, N.Y. Times, Feb. 25, 1996 (Magazine); Hate on the Internet:  Before the S. Comm. on the Judiciary, 106th Cong. (1999) (statement of the Anti-Defamation League on hate on the Internet), available at http://judiciary.senate.gov/oldsite/91499ad.htm; Beverly Ray & George E. Marsh II, Recruitment by Extremist Groups on the Internet, First Monday (2001) (unpaginated), available at http://www.firstmonday.org/issues/issue6_2/ray/index.html; David Capitanchik & Michael Whine, Institute for Jewish Policy Research, The Governance of Cyberspace:  Racism on the Internet, Policy Paper No. 2 (1996), available at http://www.jpr.org.uk/Reports/CS_Reports/PP_2_1996/main.htm.

[8] See John Kifner, Hate Groups Are Infiltrating the Military, Group Asserts, N.Y. Times, July 7, 2006.  The United States Department of Defense reported that in a survey of 17,080 Army personnel, 3.5 percent were "approached to join extremist organizations since joining the Army."  News Release, Dep't of Defense, Assistant Secretary (Public Affairs), Army Task Force Report on Extremist Activity (Mar. 21, 1996).

[9] As a result, restrictions on political speech in the military and in the national security context are permitted that would

between a member of the public and a member of the military is that the state gives a member of the military permissive sanction to use force in the name of the state. Part of the understanding that comes with that permit is the expectation and responsibility that the threat of state-sanctioned violence will not be wielded for unlawful purposes. If civil society perceives the military as racist, or its members as racist, civilians will be less willing to tolerate and support the performance of essential military missions at home. These might include the provision of security at special events, homeland defense, and search, rescue, and security missions in the face of natural and man-made disasters beyond the capacity of local responders.[10] A military force that is perceived to be racist or undisciplined will be less effective in this myriad of civilian contexts in which they might be deployed at home. They may be

---

not be permitted in other contexts. See 18 U.S.C. § 61h (upheld in United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 93 (1947)); United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 556 (1973). Although the Hatch Act was later modified to allow increased political participation on behalf of regular government employees, this amendment does not apply to servicemembers. 5 U.S.C. §§ 7321, 7322; Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94 § 2(a), 107 Stat. 1001 (1993).

[10] See Office of Homeland Security, The National Strategy for Homeland Security (Oct. 2007).

neither trusted nor welcomed.[11]  At which point, they may not be effective.

Third, the Government has a compelling interest, especially during time of conflict, in recruiting and sustaining an all-volunteer force of sufficient strength and quality to provide for the nation's security and to sustain that security over time.  As is well documented in the print media, meeting recruiting goals is an annual challenge.[12]  Where members of the

---

[11] President Eisenhower deployed the 101st Airborne to Little Rock, Arkansas, to help integrate the public schools following Brown v. Board of Education, 347 U.S. 483 (1954).  NAACP Legal Defense and Educational Fund, Inc., The Little Rock Nine 50th Anniversary:  A page from LDF History (2007), http://www.naacpldf.org/content.aspx?article=1209 (last visited July 14, 2008).  Over 75,000 service personnel were deployed to New Orleans and the Gulf Coast following Hurricane Katrina, including for the purpose of civil law enforcement on the streets of New Orleans.  Pam Zubeck, NorthCom Official Lists Katrina Lessons, Colo. Springs Gazette, Oct. 22, 2005.  For other examples involving the deployment of the armed forces in the domestic civil context, see Center for Law and Military Operations (CLAMO), Domestic Operational Law (DOPLAW) Handbook for Judge Advocates 55 (2001); see also Dep't of Homeland Security, The National Response Framework (Mar. 22, 2008).

[12] Consider the 2008 observation of the commanding general of the United States Army Training and Doctrine Command, General William S. Wallace:

Many young Americans are willing to serve, but too little is made of the declining number of young people who are qualified to serve.  This is the real story and it's a shocking one.  Only 28 percent of the 17- to 24-year-old population qualifies to wear a military uniform.  The other 72 percent fail to meet minimum standards on education, character and health.  Of those eligible to serve, many choose not to for a variety of reasons.

24

military bring discredit to the armed forces, including, and perhaps in particular, through the advocacy of racist views, the Government will have a more difficult time meeting its recruiting needs. What parents would want their daughter or son to serve in a unit they thought might be infected with white supremacists and closet skinheads? What soldier (other than a white supremacist) would want to have "Wskullhead" on his right or his left in combat? As this Court previously stated in Howe, "'The Federal Government may punish utterances which obstruct its recruiting or enlistment service . . . .'" Howe, 17 C.M.A. at 173, 37 C.M.R. at 437 (quoting Legislative Reference Service, Library of Congress, Constitution of the United States of America, Revised and Annotated, 1963 895 (Edward S. Corwin, Norman J. Small, & Lester S. Jayson eds., U.S. Government Printing Office 1964)).

Thus, it is evident that public support, recruiting, and the deterrence of extremist groups represent compelling governmental interests. However, a further constitutional question remains. When balanced against Appellant's free speech interests, is the impact of Appellant's words too tangential in potential effect to warrant criminal sanction? This depends in

---

Gen. William S. Wallace, Editorial, Army General Admits U.S. Lacks Qualified New Recruits, Charlotte Observer (North Carolina), June 16, 2008, available at http://www.veterans forcommonsense.org/index.cfm/Page/Article/ID/10393.

25

part on whether the Article 134(2), UCMJ, sanction is narrowly tailored to protect the compelling interests at stake.

   B.  Article 134(2), UCMJ, is Narrowly Tailored

   If the government's interests, meaning here the Nation's interests, are sufficiently compelling to regulate hate speech, the question becomes is Article 134(2), UCMJ, narrowly tailored to achieve those interests?  Applying the framework presented above, there are three potential limits on the reach of the discrediting service clause into the realm of protected First Amendment speech.

   First, the Government has not sought to proscribe Appellant's free speech generally.  It has sought to proscribe his speech while in uniform, which is to say:  (1) while he is identifying himself or otherwise holding himself out as an Army paratrooper, and (2) doing so in a public forum.  Moreover, it is not Appellant's distasteful words that are the source of sanction; it is the discrediting nature of those words in the context of the Government's compelling interests.  Merely distasteful words would not have the same effect on the Government's interests.  Nor would the failure by the Army to penalize merely distasteful words have the same effect on the military institution in public esteem.

   Second, as noted above, the legal test in the military context involves two steps.  The Government must have a

26

compelling interest(s) to protect and the Article 134(2), UCMJ, sanction must be narrowly tailored in application to protect that compelling interest(s). Then, in accordance with <u>Priest</u>, military judges and this Court must balance that interest against the servicemember's speech interest in the context presented. Given the potential for a broad and uncertain application of the General Article, this balancing remains an essential additional safeguard on the protection of appropriate military speech.

Finally, Article 134(2), UCMJ, like Article 133, UCMJ, does not operate in a constitutional vacuum. To the contrary, military custom and practice as interpreted by this Court inform and delimit the potential reach of Article 134(2), UCMJ. <u>Parker</u>, 417 U.S. at 752-53. As the Supreme Court noted in <u>Parker</u> with respect to Article 133, UCMJ, citing to history and tradition:

> The Court of Military Appeals has likewise limited the scope of Art. 133. Quoting from W. Winthrop, Military Law and Precedents 711-712 (2d ed. 1920), that court has stated:
>
> "'". . . To constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents."'"

Id. at 753-54 (quoting Howe, 17 C.M.A. at 177-78, 37 C.M.R. at 441-42).

For these reasons, I would find that the Government's interests are compelling in this case. Of course, here, part of the problem in applying a First Amendment test to Appellant's words is that it is hard to imagine that anything so absurd could present anything but a tangential threat to a compelling governmental interest. But, if Appellant's speech contained on his profiles is protected speech, it is not hard to imagine the cascading effect on the military institution of additional members of the military took up this perceived mantle of free speech.

I would further conclude that Article 134(2), UCMJ, as applied in this case, is narrowly tailored to protect those compelling interests, provided the Article is limited in application to Appellant's profiles. These profiles were public, racist, and identified Appellant as an Army paratrooper. Appellant also relied on his military identity to advertise and advance his racist message and agenda.[13]

---

[13] By point of constitutional comparison, I would reach a different result with respect to those portions of the charge that related to Appellant's e-mail exchanges with Investigator Sturm posing as "Country Bumpkin," a feigned fellow traveler on the path of racist extremism, if these e-mails were still in legal play. While the e-mails were entered into evidence and may serve to inform judgments about the meaning and intent of the AOL profiles, they cannot serve as independent basis for an

The fact that Appellant's words appeared on the Internet on a profile does not transform this case from one of public conduct to one of private conduct. The Internet profile is the modern equivalent of standing on a street corner in uniform with a sign saying "I'm in the Army and I am a racist and Aryan extremist." This may not be a busy corner -- we should hope that it is not -- but it is a public corner nonetheless. Indeed, where the Internet is concerned, the impact of the metaphorical back alley protest may be magnified in time and distance in a manner distinct from that taking place in an actual back road or alley. Persons from all over the world may see it, and at a time when the street protester in uniform has long ago put the placard away, the racist message on the Internet lingers.

As one professional military observer noted:

We cannot put the Internet genie back in the bottle. The World Wide Web is pervasive, unregulated, and a powerful molder of opinion. The average lance corporal . . . today does not remember a time when there was no Internet, no camera cell phone, and no text messaging. In that context he/she is a "digital native." This means of communication is as natural to him/her as a letter home was to . . . previous generations. The status symbol today for the "wired generation" is how many friends you have on your MySpace or Facebook page. The difficult task for leaders . . . is to convince them that once they put on the [uniform]

---

Article 134(2), UCMJ, conviction. Distasteful as their content may be, the messages do not cross the line into incitement, conspiracy, or attempt. Nor are they service discrediting. These e-mails were private communications between two apparently like-minded individuals, engaged in conversation.

everyone who sees them, even if it is through social media, sees them as representatives of the United States [military].[14]

We cannot put the Internet genie back in the bottle. Nor should we hope or wish to. The genie is a source of morale in the field. It is a means of familial communication. And, it is a ubiquitous instrument that allows each bad idea to be met by a better idea. What we can do is ensure that it is not used to discredit the armed forces and undermine compelling national interests. This is done through education, appropriate and lawful regulation, and where necessary, criminal sanction; and, where speech is involved, through application of an exacting constitutional review.

---

[14] John Keenan, Editorial, The Image of Marines, Marine Corps Gazette, May 2008, at 3.